**SAMARITAN HEALTH CENTER, et al., Plaintiffs,**

v.

**Margaret M. HECKLER, Defendant.**

**Civ. A. No. 85–0464.**

United States District Court, District of Columbia.

July 12, 1985.

Supplemental Memorandum Aug. 29, 1985.

James L. Feldesman, Klores, Feldesman & Tucker, Washington, D.C., for plaintiffs.

Richard K. Willard, Acting Asst. Atty. Gen., Civ. Div., Joseph E. DiGenova, U.S. Atty., Ellen Lee Park, Asst. U.S. Atty., Sandra M. Schraibman, Keith Fischler, Attorneys, Civ. Div., Washington, D.C., for defendant; Terry Coleman, Acting Gen. Counsel, Ann Hunsaker, Asst. Gen. Counsel, Denise Rodriguez, Atty., U.S. Dept. of Health & Human Services, Washington, D.C., of counsel.

## MEMORANDUM

OBERDORFER, District Judge.

By agreement of the parties, this matter has been submitted on the merits. For reasons set forth in a Memorandum to be filed, an accompanying order will declare that the Court has jurisdiction over the plaintiffs' complaint, that the plaintiff hospitals have standing to sue, and that the Secretary also has a clear, nondiscretionary duty to develop and publish a definition of "disproportionate share" hospitals * and to identify those hospitals to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate. Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 2315(h), 98 Stat. 494, 1080. Accordingly, the Secretary will be required to develop a proposed plan and timetable for defining and identifying disproportionate share hospitals. The order will grant plaintiffs' motion to amend the complaint, and will also dismiss plaintiffs Samaritan Medical Executive Committee and Semi-Quois Neighborhood Improvement and Employment Project, Inc., because they are not providers and therefore are not within the zone of interests that the statutes in question were designed to protect.

There remains a question as to whether the Secretary has a duty, enforceable by mandamus, to provide for exceptions and adjustments. In particular, the Conference Report on the Deficit Reduction Act states that Congress wanted the Secretary to define disproportionate share hospitals "so that a better determination can be made under existing law as to *whether* payment exceptions or adjustments are appropriate." H.R.Rep. 98–861, 98th Cong., 2d Sess. 1356 (1984), U.S.Code Cong. & Admin.News 1984, pp. 697, 2044 (emphasis added). The Court does not have the benefit of briefs by the parties addressed to the

---

* 42 U.S.C. § 1395ww(d)(5)(C)(i).

question of what effect this "subsequent" legislative history should have on the interpretation of the disproportionate share provision. In addition, the House Report on the disproportionate share statute itself suggests that if the Secretary determines that exceptions and adjustments are appropriate, the Secretary would be "authorized" to provide for exceptions and adjustments. H.R.Rep. No. 25, 98th Cong., 1st Sess. 142 (1983), U.S.Code Cong. & Admin.News 1983, pp. 143, 361. In contrast, the Senate Report states that the Secretary would be "required" to provide exceptions or adjustments. The parties have not fully briefed the Court about how these conflicting statements should be weighed. The parties will therefore be required to file simultaneous supplemental memoranda, with attention to Supreme Court and D.C. Circuit precedent, as to the effect of the legislative history on the Secretary's duty to provide exceptions and adjustments pursuant to 42 U.S.C. § 1395ww(d)(5)(C)(i).

## ORDER

For the reasons set forth in an accompanying Memorandum, it is this 12th day of July, 1985, hereby

ORDERED: that plaintiffs' motion for leave to amend the complaint be, and is hereby, GRANTED; and it is further

ORDERED, ADJUDGED and DECLARED: that the Court has jurisdiction over the plaintiffs' complaint and the plaintiff hospitals have standing to sue; and it is further

ORDERED, ADJUDGED and DECREED: that plaintiffs' motion for a preliminary injunction be, and is hereby, DISMISSED, as moot; and it is further

ORDERED, ADJUDGED and DECREED: that defendant's motion to dismiss be, and is hereby, GRANTED as to plaintiffs Semi-Quois Neighborhood Improvement and Employment Project, Inc. and Samaritan Medical Executive Committee; and it is further

ORDERED, ADJUDGED and DECREED: that defendant's motion to dismiss be, and is hereby, DENIED as to the remaining plaintiffs; and it is further

ADJUDGED and DECLARED: that the Secretary has a clear, nondiscretionary duty to develop and publish a definition of disproportionate share hospitals and to identify those hospitals to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate, as required by section 2315(h) of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 1080; and it is further

ORDERED: that the defendant shall, on or before July 26, 1985 serve and file (with a courtesy copy to Chambers) a proposed plan and timetable for publishing a definition of disproportionate share hospitals, and for identifying the hospitals which meet that definition to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate; and it is further

ORDERED: that the plaintiffs shall, on or before August 1, 1985 serve and file (with a courtesy copy to Chambers) any response to the defendants' proposed plan and timetable; and it is further

ORDERED: that the parties shall file, on or before July 25, 1985, simultaneous supplemental memoranda addressing the effect of the legislative history and "subsequent" legislative history of the disproportionate share provision on the Secretary's duty to provide exceptions and adjustments pursuant to 42 U.S.C. § 1395ww(d)(5)(C)(i).

## SUPPLEMENTAL MEMORANDUM

On July 12, 1985, the Court issued an order declaring, among other things, that the defendant has a clear, nondiscretionary duty to develop and publish a definition of "disproportionate share" hospitals pursuant to section 2315(h) of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 1080.[1] The Memorandum accom-

---

**1.** The order also required the defendant to submit a proposed timetable for the publication of

this definition and instructed the plaintiff to respond to the defendant's proposal. In addi-

panying the July 12 order advised the parties that the reasons for the Court's decision would be set forth in a Memorandum to be filed. This is that Memorandum.

## I.

Plaintiffs are a hospital executive committee, a neighborhood improvement and employment project and five non-profit, charitable hospitals which provide comprehensive health care services, including service to elderly and other low-income segments of the population.[2] They sue the Secretary of Health and Human Services, charging that she has failed to carry out congressional enactments requiring her to promulgate special provisions for the compensation of hospitals which serve a disproportionately high number of elderly and poor patients. Plaintiffs argue that because of the Secretary's failure to promulgate these provisions, they have incurred or will suffer severe unrecoverable operating losses which place them in financial jeopardy.

Plaintiffs claim that their plight stems from the Social Security Amendments of 1983, Pub.L. No. 98–21, 97 Stat. 65. The amendments established the prospective payment system (PPS), which provides that Medicare will pay for hospital inpatient operating costs on the basis of predetermined rates. *See* 42 U.S.C. § 1395ww(d). The amount of payment that a hospital receives for treating Medicare patients is based, in part, on a fixed rate for patient discharges. The rate to be paid upon the discharge of a given patient is determined according to the "Diagnosis Related Group" (DRG) which describes the patient's primary malady. 42 U.S.C. § 1395ww(d)(1)(A), (G). Because the payment for any given DRG is fixed in advance, PPS differs from its predecessor cost reimbursement system in that it does not consider the actual length of a particular patient's hospital stay or the cost actually incurred by the hospital in rendering services. The PPS system therefore fails to account for the fact that poor and unhealthy patients often need more medical assistance than patients drawn from a more affluent and healthier population. For example, if a patient were admitted for an appendectomy, but also required treatment for complications arising from malnutrition, the hospital would only be entitled to payment for the appendectomy.

The plaintiffs have established in their uncontroverted affidavits that they serve less healthy and thus more costly populations. For example, the area in which Samaritan Health Center is situated has a high level of poverty, a high proportion of elderly persons, a high infant mortality rate, and a low physician-to-patient ratio. As a result, the federal government has designated major portions of the area served by Samaritan as "medically underserved," 42 U.S.C. § 254c(3), and suffering from a "health manpower shortage," 42 U.S.C. § 254e.[3] Moreover, the plaintiffs have encountered other unusual costs associated with attending a population with a disproportionate number of Medicare and low-income patients, *e.g.*, the need to pay higher wages, extra security costs, the need for especially comprehensive inpatient and outpatient services, and higher administrative expenses. Two of the plaintiffs—Samaritan Health Center and Mercy Hospital and Medical Center—are already losing

tion, the parties were ordered to file briefs addressing the legislative history of 42 U.S.C. § 1395ww(d)(5)(C)(i), the so-called "disproportionate share provision." This Memorandum will decide the issues raised by these supplemental pleadings.

**2.** On May 9, 1985, the plaintiffs moved to amend their complaint to add the Samaritan Medical Executive Committee and St. Mary's Hospital of East St. Louis as plaintiffs. The defendant urged that the amended complaint be dismissed, but did not oppose the motion to amend. Accordingly, the July 12 order granted the plaintiffs' motion.

**3.** *See* Affidavit of John R. McIntire at ¶ 9; *see also* Affidavit of Thomas W. Chapman (Greater Southeast Community Hospital, Inc., Washington, D.C.); Affidavit of Sheila Lyne (Mercy Hospital and Medical Center, Chicago, Illinois); Affidavit of Jeffrey Baird (Mercy Hospital, Toledo, Ohio); Affidavit of R. Michael Wise (Mount Carmel Mercy Hospital, Detroit, Michigan); Affidavit of Philip J. Karst (St. Mary's Hospital of East St. Louis, East St. Louis, Illinois).

substantial sums of money because of PPS. *See* McIntire Affidavit at ¶¶ 7–27; Lyne Affidavit at ¶¶ 11–26; *see also* Lyte Affidavit at ¶ 17. The remaining plaintiffs claim that they will soon be losing money as well. *See* Chapman Affidavit at ¶¶ 9–22, 26–29; Baird Affidavit at ¶¶ 6–9, 12–18, 20–23; Wise Affidavit at ¶¶ 10–14, 18–24, 26–28; Karst Affidavit at ¶¶ 7–11, 14–22, 24–28.

Congress addressed this gap in the PPS in section 1886(d)(5)(C)(i) of the Social Security Act, 42 U.S.C. § 1395ww(d)(5)(C)(i), which states that:

> The Secretary *shall* provide for such exceptions and adjustments to the payment amounts established under this subsection *as the Secretary deems appropriate* to take into account the special needs ... of public or other hospitals that serve a significantly disproportionate number of patients who have low income or are entitled to benefits under part A of this subchapter. [Emphasis added.]

The Secretary has yet to implement this so-called "disproportionate share provision." In January of 1984, the Administrator of the Health Care Financing Administration (HCFA), the Secretary's delegate for administration of the Medicare program, announced that the Secretary "did not make special provisions for these hospitals in the regulations (§ 405.476) because our current data do not show that an adjustment is warranted." 48 Fed.Reg. 276 (1984). Congress subsequently enacted section 2315(h) of the Deficit Reduction Act of 1984. That section provides:

> The Secretary of Health and Human Services *shall,* prior to December 31, 1984—
> (1) develop and publish a definition of "hospitals that serve a significantly disproportionate number of patients who have low income or are entitled to benefits under part A" of Title XVIII of the Social Security Act for purposes of section 1886(d)(5)(C)(i) of that Act, and

(2) identify those hospitals which meet such definition and make such identity available to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate.

Deficit Reduction Act, Pub.L. 98–369, § 2315(h), 98 Stat. 494, 1080 (1984) (emphasis added) (quoting 42 U.S.C. § 1395ww(d)(5)(C)(i)). It is undisputed that the Secretary has neither published a definition nor identified the hospitals which meet that definition.

According to the plaintiffs, these statutes impose on the Secretary a nondiscretionary duty to promulgate regulations providing for exceptions and adjustments to the payment rates established under PPS. Although the plaintiffs concede that the Secretary has discretion to choose the ultimate form of the regulations, they contend that the statutes preclude her from determining, as she has, that she need not promulgate any regulations at all.[4]

At a hearing on the plaintiffs' motion for preliminary injunction, counsel for both parties agreed to submit this case for decision on the merits. *See* Fed.R.Civ.P. 65(a)(2). For relief, the plaintiffs seek an order requiring the Secretary (1) to implement the relevant statutes within 30 days; and (2) to reimburse, on the basis of the cost reimbursement system which preceded PPS, the two hospitals that are presently losing money on their inpatient treatment of Medicare beneficiaries. The plaintiffs have never pursued the second aspect of their proposed order, and have cited no authority for the proposition that this Court has jurisdiction to order the Secretary to reimburse plaintiffs under the now-defunct reasonable cost reimbursement system. Accordingly, the second claim for relief will be deemed abandoned.

---

**4.** The plaintiffs had also suggested that even if the Secretary has discretion to decide whether or not to provide exceptions and adjustments, she has abused that discretion by declining to act in light of the evidence that is available to her. *See* Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction at 9 & n. 5. In agreeing to submit this case on the merits on the present record, the plaintiff has elected not to press this issue and the Court expresses no opinion on it.

## II.

Defendant moves to dismiss on the theory that the Court lacks subject matter jurisdiction over the plaintiffs' claims. She also argues that the plaintiffs lack standing to bring this action.

## A.

The Secretary contends that the Court lacks subject matter jurisdiction over this suit because the Medicare administrative review process is the exclusive remedy available to plaintiffs for a challenge to this exercise of her discretion. Under the review scheme, private fiscal intermediaries determine the amount of payment due each hospital or other provider. *See* 42 U.S.C. § 1395h(a). If a provider wishes to challenge the adequacy of a notice of proposed reimbursement or a prepayment determination, it may appeal to the Provider Reimbursement Review Board (PRRB or Board). 42 U.S.C. § 1395*oo; see Tucson Medical Center v. Heckler*, 611 F.Supp. 823 (D.D.C.1985), *appeal filed* August 16, 1985. The Board's decision is in turn reviewable by the Secretary, and her decision is subject to judicial review. 42 U.S.C. § 1395*oo* (f)(1).

Defendant bases her jurisdictional challenge on the Supreme Court's decisions in *Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), and *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). According to the Secretary, the claims of each of these plaintiffs "arises under" the Medicare Act, and must therefore be considered pursuant to the administrative review process before it can be brought before this Court.

In both *Ringer* and *Salfi*, the Supreme Court interpreted 42 U.S.C. § 405(h), which has been incorporated into the Medicare statute by 42 U.S.C. § 1395ii. Section 405(h) provides, in pertinent part:

> No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal or government agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

The plaintiffs in *Ringer* challenged the Secretary's formal administrative ruling and associated instructions to fiscal intermediaries prohibiting payment of Medicare claims arising from bilateral carotid body resection, a surgical procedure that the HCFA had determined to be unnecessary. The Supreme Court concluded that the relief sought by the plaintiffs was "inextricably intertwined" with their claims for benefits, and that their claims "arose under" the Social Security Act. Because the plaintiffs therefore had an adequate administrative remedy to challenge the Secretary's decision, there was no jurisdiction under 28 U.S.C. § 1331 to consider the plaintiffs' complaint. *Ringer*, 104 S.Ct. at 2021–25. Accordingly, the plaintiffs in *Ringer* were required to exhaust their administrative remedies to permit the Secretary to render a "final decision" reviewable under 42 U.S.C. § 405(g). *Id.*

In *Salfi*, class action plaintiffs raised a constitutional challenge to a statute that prevented widows and stepchildren from recovering a deceased wage earner's benefits if they had had their relationship with him for less than nine months before his death. The Court emphasized that although the action arose under the Constitution, it also arose under the Social Security Act. The Supreme Court held that section 405(h) "bars district court federal-question jurisdiction over suits, such as this one, which seek to recover Social Security benefits." *Salfi*, 422 U.S. at 756–57, 95 S.Ct. at 2462–63.

*Ringer* and *Salfi* teach that this Court has no general federal question jurisdiction to consider claims that "arise under" the Medicare Act. Both decisions hold that a case "arises under" the Act if the relief requested is "inextricably intertwined" with a claim for benefits. This view is consistent with the holding of the Sixth Circuit Court of Appeals in *Michigan Academy of Family Physicians v. Blue Cross and Blue Shield of Michigan*, 757 F.2d 91

(6th Cir.1985), *reh'g denied,* 757 F.2d 91 (1985), a case that was remanded by the Supreme Court for reconsideration in light of *Ringer.* The court observed:

> [T]he Supreme Court in *Heckler v. Ringer, supra,* did not proscribe judicial review to challenges to the Medicare Act. where the challenge was made by a party other than a claimant for benefits.

757 F.2d at 94. Similarly, in *Starnes v. Schweiker,* 748 F.2d 217 (4th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 2022, 85 L.Ed.2d 304 (1985), which was also remanded for reconsideration in light of *Ringer,* the Court of Appeals for the Fourth Circuit reversed its earlier decision to exercise jurisdiction because "procedural irregularities in the promulgation of the caps [on reimbursement for computerized tomography] are so *inextricably intertwined with a claim for benefits* that any judicial review is barred ...." 748 F.2d at 218 (emphasis added).

■ The argument that the plaintiffs must exhaust their remedies under 42 U.S.C. § 1395oo before invoking the jurisdiction of this Court turns on the assumption that plaintiffs are seeking payment under the Medicare Act. "Consideration by the Provider Reimbursement Review Board [is confined] to disputes over the amount properly reimbursable." *Humana of South Carolina, Inc. v. Califano,* 590 F.2d 1070, 1081 (D.C.Cir.1978). Under the PPS, the Board may also review the Secretary's final decision as to the prepayment rate for a provider. 42 U.S.C. § 1395oo (a)(1)(A)(ii); *see Tucson Medical Center, supra.* But the plaintiffs do not request "that the Secretary change her policy so as to allow payment ... so that [plaintiffs] simply will not have to resort to the administrative process." *Ringer, supra,* 104 S.Ct. at 2021. A decision in plaintiffs' favor would merely require the Secretary to promulgate regulations allegedly required by statute; it would not resolve the plaintiffs' entitlement to payment. That issue would remain to be adjudicated in the administrative process.[5] Indeed, the plaintiff hospitals—as opposed to other, more needy disproportionate share hospitals—might not be entitled to a different prepayment rate even if the Secretary defines and makes exceptions and adjustments for "disproportionate share" providers. Thus, the plaintiffs' claim is not "inextricably intertwined" with a claim for benefits.

At oral argument, defendant's counsel conceded that the Secretary could not defeat this Court's jurisdiction by refusing to appoint the members of the PRRB. Defendant's failure to provide adjustments, exceptions, and a definition has an analogous impact. There is nothing for the plaintiffs to assert administratively because the Secretary has refused to promulgate the regulations by which disproportionate share prepayment rates could be fixed. Because this claim is not cognizable by the PRRB as a challenge to reimbursement or prepayment rates, the plaintiffs have no access to judicial review other than through this action. *See National Association of Home Health Agencies v. Schweiker,* 690 F.2d 932, 938 (D.C.Cir. 1982), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983). Our Court of Appeals has held that section 405(h) does not "preclude judicial review of claims for which no alternative form of judicial review [is] available," *id.* at 941, and this action may therefore be considered under the Court's general federal question jurisdiction.

■ The mandamus statute, 28 U.S.C. § 1361, also provides a firm basis for jurisdiction. Section 405(h) precludes actions brought under "section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter," but does not mention whether jurisdiction may be exercised pursuant to section 1361. The Supreme Court has explicitly declined to decide whether section 405(h) bars the exercise of

---

5. The plaintiffs originally asked for an order requiring the Secretary to compensate them with "specific financial relief." Amended Complaint at 13. The plaintiffs have, however, effectively abandoned this claim. *See* pp. 509–510, *supra.*

jurisdiction under section 1361. *Ringer, supra,* 104 S.Ct. at 2022. Moreover,

> [o]ur Court of Appeals has recognized that § 405(h) does not preclude mandamus jurisdiction in Medicare cases alleging "undue delay or plain departure from statutory procedures" ... and that mandamus is foreclosed only in cases "in which statutory procedures authorize review of the particular action" at issue.

*National Association of Rehabilitation Facilities [NARF] v. Schweiker,* 550 F.Supp. 357, 363 (D.D.C.1982) (quoting *Association of American Medical Colleges v. Califano,* 569 F.2d 101, 112–13 (D.C.Cir. 1977)). Because the PRRB cannot review the Secretary's refusal to act, and because the plaintiffs allege that the Secretary has failed to respond to a clear statutory command, this action can be considered pursuant to section 1361.

### B.

The Secretary argues that the plaintiffs lack standing to bring this action because they are unable to demonstrate that they will be eligible for disproportionate share funding even if the Secretary promulgates appropriate regulations. The Secretary reasons that the plaintiffs have therefore failed to allege the concrete injury that is required by Article III.

■ The plaintiffs have suffered a concrete injury: they have absolutely no opportunity to become eligible for disproportionate share funding unless the Secretary promulgates appropriate exceptions and adjustments, or a definition of disproportionate share hospitals. Our Court of Appeals has recognized that a concrete injury is alleged where plaintiff hospitals demonstrate a "sharp curtailment of their opportunities for funding." *National Association of Neighborhood Health Centers [NANHC] v. Matthews,* 551 F.2d 321, 329 (D.C.Cir.1976) (footnote omitted). Thus, "[w]hile the relief that these plaintiffs seek

here, i.e., promulgation of ... regulations, may not inevitably redress [their] injuries, it is an absolutely necessary first step." *See NARF v. Schweiker, supra,* 550 F.Supp. at 364. Similarly, the Court of Appeals emphasized in *NANHC:*

> [w]hile it is not certain that NANHC members would be funded due to the extra recovery from their claim here, it is probable that the prospect of funding, itself substantial relief, would be enhanced.

551 F.2d at 329 (footnote omitted). The plaintiffs have demonstrated in uncontroverted affidavits that they are among the intended beneficiaries of the disproportionate share provision. Since they are therefore arguably qualified to receive an adjusted prepayment, "they need not shoulder the additional burden of demonstrating that they are certain to receive funding." *West Virginia Association of Community Health Centers v. Heckler,* 734 F.2d 1570, 1576 (D.C.Cir.1984). This concrete injury—the foreclosure of plaintiffs' opportunity to receive additional funding and the corresponding handicap on plaintiffs' ability to engage in financial planning [6]—may be redressed by an order declaring that the Secretary has a duty to promulgate regulations pursuant to the disproportionate share provision and section 2315(h) of the Deficit Reduction Act.

■ Moreover, the plaintiff hospitals satisfy prudential Article III standing requirements because they are within the "zone of interests" that the disproportionate share provision was designed to protect. *See Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The plaintiff hospitals have established, by uncontroverted affidavits, that they serve a population with a disproportionate number of low-income, elderly and otherwise less healthy persons. McIntire Affidavit at ¶¶ 6–9, 11;

---

**6.** The plaintiffs have not specifically cast their request for relief in these terms. However, as the Court of Appeals has emphasized, "it is not necessary that [plaintiffs] plead their injury in terms of a legal conclusion." *West Virginia*

*Association of Community Medical Centers, supra,* 734 F.2d at 1574 n. 5. The plaintiffs are clearly concerned, at a minimum, that their *opportunity* for funding has been impaired by the Secretary's inaction.

Chapman Affidavit at ¶¶ 9–12; Lyne Affidavit at ¶¶ 12–13; Baird Affidavit at ¶¶ 6–8; Wise Affidavit at ¶¶ 10–13; Karst Affidavit at ¶¶ 6–10. The disproportionate share provision was a congressional response to the fear that populations like the ones served by the plaintiff hospitals "may be more severely ill than average and that the DRG payment system may not adequately take into account such factors." S.Rep. No. 23, 98th Cong., 1st Sess. 54 (1983), *reprinted in* 1983 U.S.Code Cong. & Ad.News at 194; *see also* H.R.Rep. No. 25, 98th Cong., 1st Sess. 141–42, *reprinted in* 1983 U.S.Code Cong. & Ad.News at 360–61.

The Secretary apparently does not dispute that the plaintiffs' interests are within the zone protected by the disproportionate share provision, but argues that the plaintiffs nonetheless lack standing to challenge her failure to comply with section 2315(h) of the Deficit Reduction Act. According to the Secretary, section 2315(h) was enacted in order to obtain information for congressional committees, not for the benefit of the plaintiffs. Section 2315(h)(1) requires the Secretary to publish a definition of " 'hospitals that serve a significantly disproportionate number of patients who have low income or are entitled to benefits under Part A' " of the Medicare Act. Deficit Reduction Act of 1984, Pub.L. 98–364, § 2315(h)(1), 98 Stat. 494, 1080 (1984) (quoting 42 U.S.C. § 1935ww(d)(5)(C)(i)). Section 2315(h)(2) demands that the Secretary identify the hospitals "which meet such definition and make such identity available to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate." Section 2315(h)(2) benefits the congressional committees which have asked the Secretary to identify the hospitals that would be covered by the disproportionate share regulations, but it also enhances the financial planning capability of the hospitals so identified. Moreover, section 2315(h)(1) flatly requires the Secretary to publish a definition. If Congress had needed a working definition

for its own use, it could have invited the Secretary or her representative to testify before an appropriate committee, or to submit a report. By requiring the Secretary to promulgate a definition, Congress acted to give providers notice of the ambit of the disproportionate share principle.

■ That Congress intended to assist disproportionate share providers is evident in the relevant legislative history. According to the Conference Report, section 2315(h)

> reflects the conferees' concern about the potentially harmful impact of the prospective payment system on public and other hospitals serving a significantly disproportionate number of patients who have low income or who are entitled to benefits under Part A. As the Committee on Ways and Means and the Committee on Finance stated in their reports on the original 1983 prospective payment legislation, such hospitals may serve patients who are more severely ill than average and the DRG payment system may not take this factor into account.

H.R.Report No. 861, 98th Cong., 2d Sess. 1356 (1984), U.S.Code Cong. & Admin. News 1984, pp. 697, 2044. This language indicates that the interests of hospitals like plaintiffs are within the zone that section 2315(h) was designed to protect. Moreover, the language used in section 2315(h)(1) explicitly tracks the language of the disproportionate share statute. As noted above, the plaintiffs fall within the zone of interests protected by the disproportionate share provision. *See* pp. 512–513, *supra.* Inasmuch as section 2315(h)(1) calls upon the Secretary to define the terms used in the disproportionate share provision, it is directed toward the same interests as the original statute. Accordingly, Article III prudential standing limitations do not prevent the plaintiff hospitals from asserting a claim under section 2315(h).[7]

---

**7.** Plaintiffs Samaritan Medical Executive Committee (Committee) and Semi-Quois Neighborhood Improvement and Employment Project,

Inc. (Semi-Quois) do not satisfy prudential standing limitations. Neither of these plaintiffs are providers of services eligible for reimburse-

■ Finally, the Secretary argues that the plaintiffs have no cause of action under the Deficit Reduction Act. Nevertheless, the plaintiffs have arguably stated a cause of action under the Mandamus Act, 28 U.S.C. § 1361. *Cf. Council of and for the Blind of Delaware County Valley, Inc. v. Regan,* 709 F.2d 1521, 1533 (D.C.Cir.1983) (*en banc*). The question, to be addressed below, is whether the plaintiffs may invoke that remedy.

### III.

■ After this case was argued and taken under advisement, the Secretary promulgated an "interim" disproportionate share regulation pursuant to a preliminary injunction entered by the United States District Court for the Northern District of California in *Redbud Hospital District v. Heckler,* No. C–84–4382 MHP (June 14, 1985). *See* 50 Fed.Reg. 27,208 (1985). The question of whether the Secretary has a duty to promulgate disproportionate share regulations has not, however, been finally resolved. The Secretary appealed the district court's order and concluded that "[t]hese rules will be null and void in the event that either (a) a stay of the June 14, 1985 order is entered by a higher court or (b) the June 14, 1985 order is reversed on appeal." *Id.* On July 24, Circuit Justice Rehnquist stayed the *Redbud* injunction "insofar as [it] orders the Secretary to promulgate and apply nationwide regulations." *Heckler v. Redbud Hospital District,* —— U.S. ——, 106 S.Ct. 1, 4, 87 L.Ed.2d 677 (1985) (Rehnquist, Circuit Justice). Justice Rehnquist emphasized his belief that

> the District Court's use of a "preliminary injunction" to require the Secretary to issue regulations of nationwide application would prompt at least four Members of this Court to grant review should the

Court of Appeals affirm that aspect of the District Court's order.

*Id.,* 106 S.Ct. at 3, 4. Therefore, the controversy over the Secretary's duty to provide for exceptions and adjustments under the disproportionate share provision remains alive. Moreover, Justice Rehnquist's stay clearly focuses on the propriety of the *Redbud* court's issuance of a mandatory preliminary injunction and does not implicate this Court's authority to issue a final decree.

In any event, the Secretary has not yet published the definition of disproportionate share hospitals allegedly required by section 2315(h) of the Deficit Reduction Act. This issue thus remains unaffected by the Secretary's interim rulemaking and Justice Rehnquist's decision in *Redbud.*

### A.

The plaintiffs' argument on the disproportionate share provision focuses on the part of the statute which states that "[t]he Secretary *shall* provide for such exceptions and adjustments to the payment amounts established under [the PPS] ...." 42 U.S.C. § 1395ww(d)(5)(C)(i) (emphasis added). According to the plaintiffs, the use of the word "shall" demonstrates that Congress intended to impose upon the Secretary a clear, nondiscretionary duty to take action sufficient to "provide for such exceptions and adjustments."

The defendant argues that this reading of the statute is rebutted by language suggesting that the Secretary need only make such exceptions and adjustments "as [she] deems appropriate." *Id.* The Secretary contends that this clause permits her to determine, in her discretion, whether or not it is appropriate to provide for *any* exceptions and adjustments. She reasons that she has exercised this discretion by concluding that "our current data do not show

ment or prepayment under Medicare. Since Congress was apparently concerned only about the financial burdens that disproportionate populations might impose upon providers, neither the Committee nor Semis-Quois are within the zone of interests that the disproportionate share provision and the Deficit Reduction Act were

designed to protect. Accordingly, the July 12, 1985 order dismissed these two plaintiffs. The affidavit submitted by Alice Lyte, Founder and Chief Executive Officer of Semi-Quois, will be considered as evidence to the extent that it bears upon the situation of plaintiff Samaritan Health Center.

that an adjustment is warranted." 49 Fed. Reg. 276 (1984). Plaintiffs respond that Congress has already determined that the "special needs" of disproportionate share hospitals must be accommodated with PPS "exceptions and adjustments," and that the Secretary therefore has discretion only as to the *form* that these "exceptions and adjustments" will take.

■ The starting point for statutory interpretation is, of course, the language of the statute. However, the language of the disproportionate share provision is ambiguous. The word "shall" is a term of command which implies that Congress ordered the Secretary to provide for exceptions and adjustments. *See Association of American Railroads v. Costle*, 562 F.2d 1310, 1312 (D.C.Cir.1977). On the other hand, the phrase "as the Secretary deems appropriate" suggests that the Secretary has discretion to decide whether exceptions and adjustments will be provided at all. In *United States v. Reeb*, 433 F.2d 381 (9th Cir.1970), *cert. denied*, 402 U.S. 912, 91 S.Ct. 1391, 28 L.Ed.2d 654 (1971), the court, interpreting the language of an agency regulation, observed that " 'shall' may sometimes be directory only, just as 'may' may be mandatory." *Id.* at 383. Noting that the regulation linked "shall" with the phrase "if at all practicable," the court stated that "[t]he latter words seem more in keeping with the expression of a preference than the announcement of a command." *Id.; see also Buckley v. Valeo*, 519 F.2d 821, 893 n. 191 (D.C.Cir.1975), *modified*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Thus, where "shall" is joined with a phrase that implies discretion "[t]he interpretation of these words depends upon the background circumstances and context in which they are used and the intention of the legislative body ... which used them." *United States v. Reeb, supra*, 433 F.2d at 383.

■ It is thus necessary to examine the legislative history of the disproportionate share provision. The Conference Report on the 1983 Social Security Amendments observed that the House bill and the Senate

Amendment contained similar disproportionate share provisions, the only difference being that the Senate Amendment "also applie[d] to regional and national referral centers (including very large acute care hospitals in rural areas)." H.R.Rep. No. 47, 98th Cong., 1st Sess. 195 *reprinted in* 1983 U.S.Code Cong. & Ad.News 404, 485. The Conference Committee adopted the additional language of the Senate amendment, but assumed that the competing disproportionate share provisions were otherwise so similar that there was no reason to reconcile them. Thus, all of the Congressional reports may be considered in discerning Congress' intent.

The Conference Report stated that under the House version of the disproportionate share provision, "the Secretary would be required to provide exceptions and adjustments, as he or she deems appropriate." H.R.Rep. No. 47, 98th Cong., 1st Sess. 195, *reprinted in* 1983 U.S.Code Cong. & Ad. News at 485. This description is not particularly helpful since it merely replaces the word "shall," which appears in the statute, with the word "require." Similarly, both the Senate and House reports contain statements that do little more than track the language of the statute. The Senate Finance Committee stated that:

> Under this amendment, the Secretary would also be *required* to provide exceptions and adjustments, *as he deems appropriate*, to take into account the special needs of public or other hospitals that serve a disproportionately large number of low-income and part A medicare beneficiaries.

S.Rep. No. 23, 98th Cong., 1st Sess. 54, *reprinted in* 1983 U.S.Code Cong. & Ad. News 143, 194 (emphasis added). The House Committee on Ways and Means echoed this sentiment when it explained that under the disproportionate share provision,

> [t]he Secretary would be *required* to take into account and to make *appropriate* exemptions, exceptions and adjustments for hospitals that serve a disproportionately large number of medicare and low-income individuals.

H.R.Rep. No. 25, 98th Cong., 1st Sess. 141, *reprinted in* 1983 U.S.Code Cong. & Ad. News 219, 360 (emphasis added). However, the Ways and Means Committee went on to explain what it meant by this statement:

> If upon review the Secretary determines that such exemptions, exceptions or adjustments are appropriate, the Secretary would then be *authorized* to make such exemptions, exceptions or adjustments.

*Id.* at 142; 1983 U.S.Code Cong. & Ad. News at 361 (emphasis added). Moreover, both the House and Senate reports expressly noted Congress' understanding that "the Department of Health and Human Services *would continue to study* ways of taking account of severity of illness in the DRG system." *Id.;* S.Rep. No. 23, 98th Cong., 1st Sess. 54, *reprinted in* 1983 U.S.Code Cong. & Ad.News at 194 (emphasis added). Thus, Congress did not even believe that the Secretary's studies were complete, much less that disproportionate share hospitals were *entitled* to exceptions and adjustments. Both chambers of Congress understood that the Secretary was still studying the matter; the Ways and Means Committee took the additional step of emphasizing that the Secretary would be required to provide for exceptions and adjustments only if she first determined that they were appropriate.

The consistent use of the term "appropriate" in both the statute and the legislative history reinforces the conclusion that the Secretary has discretion to decide whether to provide for exceptions and adjustments. If the Secretary determines that *no* exceptions or adjustments are "appropriate," then she would not be obligated to provide for them. Her authority to make a decision as to what is "appropriate" necessarily supposes that she has discretion.

This view finds further support in the legislative history of section 2315(h) of the Deficit Reduction Act of 1984. Although this subsequent legislative history is by no means controlling evidence of the intent that Congress had in enacting earlier legislation, it is nonetheless entitled to some weight, particularly when it reinforces the intent that Congress expressed in the history of the original legislation. *See Wilson v. Block,* 708 F.2d 735, 750 (D.C.Cir.), *cert. denied,* 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983) and *sub nom. Hopi Indian Tribe v. Block,* 464 U.S. 1056, 104 S.Ct. 739, 79 L.Ed.2d 197 (1984). The Conference Report accompanying the Deficit Reduction Act states that Congress wanted the Secretary to define disproportionate share hospitals "so that a better determination can be made under existing law as to *whether* payment exceptions and adjustments are appropriate." H.R.Rep. 98–861, 98th Cong., 2d Sess. 1356, *reprinted in* 1984 U.S.Code Cong. & Ad.News 1445, 2044 (emphasis added). The Report also emphasizes that "[t]he Conferees wish to reaffirm their directive, contained in the 1983 legislation, that the Secretary provide for exceptions and adjustments for such hospitals *if* she determines them to be appropriate." *Id.* (emphasis added). This language is consistent with the legislative history of the disproportionate share provision, and thus reinforces the view that Congress authorized the Secretary to determine, in the first instance, whether exceptions and adjustments were to be provided at all.

Indeed, Congress made these statements *after* the Secretary had announced her decision that she would not make any exceptions and adjustments. The Conferees expressed "their concern about the adequacy of efforts that have been made to date to determine whether such exceptions or adjustments might be needed." *Id.* Thus, Congress was aware that the Secretary had declined to provide for exceptions and adjustments. Nevertheless, Congress did not change the disproportionate share provision in response to the Secretary's claim to discretion. Rather, it acquiesced in her interpretation of the statute and required only that she promulgate a definition of disproportionate share hospitals. Congress' acceptance of the Secretary's interpretation lends further support to her view of the statute. *See, e.g., NLRB v. Bell*

*Aerospace Co.*, 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1974).

The history of the disproportionate share provision does, however, reveal one structural feature which tends to detract from this conclusion. In 42 U.S.C. § 1395ww(d)(5)(C)(iv), which appears in the same subsection of the statute as the disproportionate share provision, Congress provided that

The Secretary *may* provide for such adjustments to the payment amounts under this subsection as the Secretary deems appropriate to take into account the unique circumstances of hospitals located in Alaska and Hawaii. [Emphasis added.]

In discussing this language, the Senate Finance Committee observed that "[e]xceptions and adjustments would also be *permitted* to take into account the special needs of hospitals located in Alaska and Hawaii." S.Rep. No. 23, 98th Cong., 1st Sess. 54, *reprinted in* 1983 U.S.Code Cong. & Ad.News at 194 (emphasis added). The distinction between the mandatory language of the disproportionate share provision and the permissive language of this section implies that Congress intended to require the Secretary to create exceptions and adjustments for disproportionate share hospitals, whereas it merely authorized her to make such exceptions and adjustments in other situations. *See Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 843 (D.C.Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984). Although this implication is somewhat troubling, it does not refute the clear statements of intent articulated in the House Report and the subsequent legislative history of the Deficit Reduction Act.

Finally, the decision of the district court in *Redbud Hospital District v. Heckler*, [1984–2 Transfer Binder] Medicare and Medicaid Guide CCH ¶ 34,085 (N.D.Cal. July 30, 1984), *modified*, No. C–84–4382–MHP (June 14, 1985), *stayed in part,* — U.S. —, 106 S.Ct. 1, 87 L.Ed.2d 677 (1985) (Rehnquist, Circuit Justice), does not undermine this conclusion. In that case, the court noted that

[t]he Secretary was not given discretion to decide *whether* such hospitals have special needs; she was given discretion only to decide how best to cope with those special needs Congress had already declared to exist.

*Id.* at 9883 (emphasis added). However, the *Redbud* court relied exclusively on the language of the disproportionate share provision and did not examine the relevant legislative history. *See id.* at 9883. Since the language of the statute is at best ambiguous and the legislative history supports the Secretary's interpretation, this omission renders the *Redbud* decision unpersuasive.

■ Congress gave the Secretary discretion to provide for the exceptions and adjustments that she deemed appropriate. Since the Secretary has exercised her discretion and determined that such exceptions and adjustments are not appropriate at this time, there is no occasion to enjoin her to promulgate regulations providing for exceptions and adjustments.

### B.

■ Section 2315(h)(1) of the Deficit Reduction Act clearly required the Secretary to develop and publish, on or before December 31, 1984, a definition of disproportionate share hospitals. There is no dispute that the Secretary has failed to perform this mandatory duty within the time required. Moreover, although she claims to be proceeding expeditiously and in good faith, the Secretary had developed no timetable for the publication of this definition until the Court ordered her to do so.

### C.

■ Although the plaintiffs seek declaratory and injunctive relief, "[a]n action purportedly requesting a mandatory injunction against a federal official is analyzed as one requesting mandamus." *National Wildlife Federation v. United States*, 626 F.2d 917, 918 n. 1 (D.C.Cir.1980). As noted above, Section 2315(h) of the Deficit Reduction Act clearly requires the Secretary to develop and publish a definition of dispro-

portionate share hospitals, and to identify covered hospitals to Congress. It is undisputed that the Secretary has not performed these duties. Mandamus is appropriate in this case because the plaintiffs have a clear right to relief, the defendant has a clear duty to act, and there is no other adequate remedy available to plaintiffs. *See Council of and for the Blind of Delaware County Valley, Inc., supra,* 709 F.2d at 1533.

Of course, "mandamus is itself governed by equitable considerations and is to be granted only in the exercise of sound discretion." *Whitehouse v. Illinois Central R.R. Co.,* 349 U.S. 366, 373, 75 S.Ct. 845, 850, 99 L.Ed. 1155 (1955). In this case, however, the equities favor the plaintiffs. The plaintiffs have demonstrated, by uncontroverted affidavits, that they have suffered or will soon suffer the very injury about which Congress has repeatedly expressed concern. The plaintiffs are themselves financially threatened. Although they will not necessarily be helped when the Secretary performs her duty, publication of a definition is an essential first step. Moreover, the public interest favors granting the plaintiffs the relief that they seek. Plaintiffs serve populations that depend upon them for essential medical services. *See, e.g.,* Lyte Affidavit at ¶¶ 10–17. Concern for the health of these populations warrants an order that will permit the plaintiffs to know where they stand financially, and to plan accordingly.

For her part, the Secretary complains that she lacks sufficient data to define disproportionate share hospitals. But Congress did not call upon the Secretary to publish a perfect definition. If the definition developed now proves inadequate in the future, then the Secretary may amend her decision through appropriate administrative proceedings. The burden on the Secretary will not be great, and the equities favor a result that requires the Secretary to perform the duty that Congress had assigned to her.

There remains for consideration the date on which the Secretary should be required to publish the definition. The Order of July 12, 1985, required the Secretary to submit a proposed timetable for the publication of a definition of disproportionate share hospitals and instructed the plaintiff to respond. They have done so.

The Secretary's proposed timetable blithely disregards the fact that the Deficit Reduction Act of 1984 required the Secretary to publish the definition and accompanying list on or before December 31, 1984. Instead of providing such a definition, or as a predicate to doing so, the Secretary has embarked upon the development of an "analytical research model that accurately depicts the relationship between significant proportions of low-income patients or Medicare eligible patients and a hospital's Medicare costs." Proposed Plan and Timetable at 1. According to the Secretary, these efforts will not culminate in publication of a definition and submission of a list of hospitals until June 15, 1986.

In response to the Secretary's proposed timetable, plaintiffs have filed a statement of Nancy M. Gordon, Assistant Director for Human Resources and Community Development, Congressional Budget Office. This statement was submitted on July 29, 1984, to the Subcommittee on Health of the Senate Committee on Finance. Plaintiffs' Response to Proposed Plan and Timetable, Exhibit 1. Ms. Gordon's statement contemplates the formation of a definition by Congress without awaiting the definition required of the Secretary by the end of 1984. According to plaintiffs, the Gordon statement and the Secretary's proposed timetable demonstrate that the Secretary will have enough information by November 30 to comply with its statutory duty to supply a definition and a list. Plaintiff contends that the 1984 Act prescribes a definition, not a perfect definition, and that the original definition can later be modified to reflect the further analysis called for by the 1984 Act.

■ Ordinarily, courts should leave to the Executive Branch decisions as to how it should deploy its resources and when, within reason, it should perform duties required

of it by Congress. *Compare National Association of Rehabilitation Facilities, Inc. v. Schweiker*, 550 F.Supp. 357, 365–66 (D.D.C.1982). Moreover, as suggested by Ms. Gordon and other witnesses at the July 29, 1984 hearing, it may well be that Congress will itself act on the disproportionate payment problem. As discussed above, however, the publication of the definition by the Secretary has a broader function than informing Congress. Congress, not the courts, set the December 31, 1984 deadline by which the Secretary was to publish the definition. "Just as the doctrine of the separation of powers forbids [the Court] to trepass on lawful agency discretion, so it requires the agency to carry out faithfully its legislative charter." *Natural Resources Defense Council, Inc. v. Herrington*, 768 F.2d 1355 (D.C.Cir.1985). In the circumstances, the Secretary must "carry out faithfully" her legislative charter. Accordingly, the accompanying order will require the Secretary to publish the definition and submit the list contemplated by the Deficit Reduction Act of 1984 on or before December 31, 1985.