**JEWISH HOSPITAL, INC.,**
**Plaintiff–Appellant,**

v.

**SECRETARY OF HEALTH**
**AND HUMAN SERVICES,**
**Defendant–Appellee.**

**No. 92–5688.**

United States Court of Appeals,
Sixth Circuit.

Argued March 5, 1993.

Decided March 18, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied May 16, 1994.*

---

* Batchelder, Circuit Judge, would grant rehearing for the reasons stated in her dissent.

R. Thomas Carter (argued and briefed), Edward L. Schoenbaechler, Jan M. West (briefed), Goldberg & Simpson, Louisville, KY, for plaintiff-appellant.

James H. Barr, Asst. U.S. Atty., Office of the U.S. Atty., Louisville, KY, Donald F. Dickey, David V. Peery (argued and briefed), Dept. of Health and Human Services, Baltimore, MD, for defendant-appellee.

Donna J. Haggarty, Sanford E. Pitler (briefed), Carol S. Gown, Bennett & Bigelow, Seattle, WA, for Baptist Hosp. (Nashville, Tennessee), amicus curiae, Baptist Hosp. (Nashville, Tennessee), Baptist Hospital (Tipton), amicus curiae, Blount Memorial Hosp., amicus curiae, Bristol Regional Medical Center, amicus curiae, Erlanger Medical Center, Inc., amicus curiae, Fort Sanders, Fort Sanders Regional Medical Center, amicus curiae, George W. Hubbard Hosp., amicus curiae, Jackson–Madison County Gen. Hosp., amicus curiae, Johnson City Medical Center, amicus curiae, Regional Medical Center at Memphis, amicus curiae, St. Mary's Medical Center, amicus curiae, University of Tennessee Memorial Hosp. at Knoxville, amicus curiae and Vanderbilt Medical Center, amicus curiae.

Before: KEITH and BATCHELDER, Circuit Judges, and TAYLOR, District Judge.**

KEITH, Circuit Judge.

Plaintiff, Jewish Hospital, Inc. ("Jewish Hospital"), appeals the adverse summary judgment ruling of the district court involv-

** The Honorable Anna Diggs Taylor, United States District Judge for the Eastern District of Michigan, sitting by designation.

ing the interpretation of a Medicare reimbursement provision. Congress requires the Secretary of Health and Human Services (the "Secretary") to adjust Medicare Prospective Payment System ("PPS") payments for hospitals that provide inpatient services to a disproportionate share of low income patients. *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). The Secretary's restrictive reading of the disproportionate share adjustment serves as the basis for this appeal. *See* 42 C.F.R. § 412.106. Because the Secretary's interpretation is contrary to the clear mandate of the statute, we **REVERSE** the district court ruling and **REMAND** the case to the Secretary for the proper calculation of the disproportionate share adjustment.

## I. *THE REGULATORY FRAMEWORK*

In 1985, Congress enacted the Consolidated Omnibus Budget Reconciliation Act of 1985 (hereinafter "COBRA"). As a part of COBRA, Congress provided that the PPS system pay hospitals a prospectively determined amount per discharge based on the costs that an efficiently operating hospital should incur to provide quality services to Medicare beneficiaries based on the patient's diagnosis at the time of discharge. *See* 42 U.S.C. § 1395ww. The statute also provides for the adjustment of these payments for hospitals that provide inpatient services to a disproportionate share of low income patients. Congress sought to adjust the Medicare PPS system to recognize the higher costs incurred by hospitals that serve a large number of low income patients.

A hospital must have a certain "disproportionate patient percentage" to qualify for the Medicare adjustment at issue in the instant case. This percentage is defined as the sum of two fractions expressed as percentages and serves as a "proxy" for all low income patients. The first fraction, termed the "Medicare Low Income Proxy," is based on the number of Medicare patients served by the hospital. The statute defines this proxy as follows:

> the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for

such days) were *entitled to benefits under [Medicare]* and who were *entitled to supplemental security income benefits* (excluding any State supplementation) under [SSI], and the denominator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under [Medicare] . . .

(emphasis added). *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). The second fraction, termed the "Medicaid Low Income Proxy," is based upon Medicaid-eligible patients. The statute defines this proxy as follows:

> the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were *eligible for medical assistance under a State plan approved under subchapter XIX [Medicaid]*, but who were not entitled to benefits under [Medicare], and the denominator of which is the total number of the hospital's patient days for such period.

(emphasis added). *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

The Secretary promulgated the following regulation to implement the language of the Medicaid Low Income Proxy:

> Total Medicaid inpatient days will include all covered days attributable to Medicaid patients. . . . Medicaid covered days will include only those days *for which benefits are payable under title XIX*. Any day of a Medicaid patient's hospital stay that is not payable by the Medicaid program will not be counted as a Medicaid patient day since the patient is not considered eligible for Medicaid coverage on those days.

(emphasis added). Medicare Program, 51 Fed.Reg. 16,777 (1986). The Secretary purports to interpret Congress' statutory phrase, "eligible for medical assistance under a State plan approved under title XIX [Medicaid]" with its promulgated regulation. The Secretary argues that only those days actually paid by Medicaid can be utilized in the calculation of the proxy. The Secretary's interpretation of the Medicaid Proxy is the subject of this appeal.

## II. NATURE OF THE CASE

In the case at bar, Jewish Hospital was reimbursed for its services under the PPS system for the year ending in 1986. Jewish Hospital qualified for a disproportionate share adjustment to its Medicare reimbursement based on the number of low income patients that it serviced in the 1986 fiscal year.

In 1989, Jewish Hospital was notified by its regional Medicare Intermediary, Blue Cross and Blue Shield of Kentucky, Inc., that Jewish Hospital was to receive a limited adjustment for serving a disproportionate share of low-income patients based on the interpretation given the statute by the Secretary. Jewish Hospital disputed the Secretary's interpretation of the statute and appealed the Medicare Intermediary's decision to the Provider Reimbursement Review Board, a statutorily established body that hears appeals of disputes between hospitals and their Intermediaries. See 42 U.S.C. § 1395oo. Because no factual dispute existed, Jewish Hospital requested that the PRRB grant expedited judicial review of the Secretary's interpretation·of the disproportionate share adjustment. The PRRB granted the request, and Jewish Hospital filed the instant action in the district court on November 20, 1990.

The parties fully briefed the issues and filed cross motions for summary judgment. The district court granted the motion in favor of the Secretary in its memorandum opinion and order dated March 16, 1992. 791 F.Supp. 168. Specifically, the court stated:

We believe that the statute supports the Secretary's interpretation. However, even if that were not the case, we believe the most that could be said concerning the statute is that it is ambiguous. The parties agree that if the statute is ambiguous, the Secretary can legally choose the interpretation. We also are of the opinion that the statute, as drafted, by including the words, "for such days," means that the hospital may recover only for those days on which Medicaid patients were actually reimbursed. Had Congress intended the result sought by the plaintiff it would have left out "for such days" and made it clear that all patients on Medicaid were to be counted as part of the numerator regardless of whether they were days on which Medicaid were actually paid.

Joint Appendix at 37.

## III. ANALYSIS

### A. Standard of Review

■ This Court's review of this case is circumscribed by the Supreme Courts decision of Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In CenTra, Inc. v. United States, 953 F.2d 1051 (6th Cir.1992), we reaffirmed that Chevron was the applicable standard when reviewing an agency's interpretation of a statute it was charged to administer, stating:

In Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court explained how a court should treat an agency interpretation of statutes within the agency's ambit.

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at 842–43, 104 S.Ct. at 2781–82 (emphasis added). The Court went on to state that in determining whether an agency's answer is based on a permissible construction of a statute, a reviewing "court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construc-

tion, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. *CenTra, Inc.,* 953 F.2d at 1055–56. The *Chevron* Court further stated, however, that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9.

This Court also finds Judge Batchelder's discussion of *Chevron* in *Brown v. Rock Creek Mining Co.,* 996 F.2d 812 (6th Cir. 1993) (Batchelder, J. dissenting), instructive. There, Judge Batchelder states:

> Where the language of the regulation is clear and plain, not only is there no reason to let the Director offer an interpretation of it, and no reason to consult the legislative history, but there is every reason not to do so. First and foremost, of course, *Chevron* instructs that unless the statute's provisions are ambiguous, we are simply to give effect to the unambiguously expressed intent of Congress. 467 U.S. at 842–43, 104 S.Ct. at 2781–82. The reason for this requirement is obvious: through excursions into legislative history, a writer can find support for virtually any position.

*Id.* at 818. Accordingly, utilizing the framework of *Chevron,* we must first determine whether Congress spoke directly to this "specific issue." For if the intent of Congress is clear and the Secretary's interpretation of the statute is contrary to that intent, "that is the end of the matter...." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

**B. The Legislative Mandate is Clear from the Statutory Language**

Congress enacted the disproportionate share adjustment to balance the inequities which exist for hospitals that treat a disproportionate number of low income patients. Congress chose to address this problem with the Medicaid proxy and utilized the following phrase in its calculation:

> the number of the hospital's patient days for such period which consist of patients who (for such days) were *eligible* for medi-

cal assistance under a State plan approved under title XIX.

Looking to the plain language of the statute, the word "eligible" refers to whether a patient is capable of receiving federal medical assistance or Medicaid. There is no indication from the text of the statute that Congress intended to impute any special meaning to the term, eligible. Additionally, the phrase, "the number of the hospital's patient days for such period," modifies the term eligible. Facially, this phrase speaks to the aggregate number of days for which a hospital provides Medicaid eligible services. Thus, it appears that all days for which an individual is capable of receiving Medicaid should be figured into the proxy calculation.

The Secretary's regulation limits the calculation to those days for which a state actually renders payment of Medicaid benefits. Specifically, the Secretary extracts the parenthetical phrase "for such days" and argues that the phrase acts as a restrictive qualifier. For such days, according to the Secretary, thus takes on the meaning of "state paid days" or the actual duration of state rendered Medicaid benefits.

The Secretary's interpretation runs counter to the language of the statute. First, the parenthetical "for such days" serves only as the antecedent to the initial phrase "the number of the hospital's patient days for such period." The parenthetical does *not* take on new meaning because it is restated in different form or placed immediately prior to the term "eligible". The aggregate number of a "hospital's patient days" referred to in the proxy should thus remain unaltered.

Additionally, the notion of "eligibility" refers to the "qualification" for benefits or the capability of receiving those benefits. Congress explicitly refers to a period of eligibility equal to the time for which medical assistance was available. Congress, however, did not refer to the time period for which a given state actually renders Medicaid payment. Absent some affirmative statement to the contrary, this Court will not seek guidance for this crucial federal legislation in a state program that may be readily altered by state legislative fiat. Congress sought to structure a proxy that is definable and accessible, one

that would not be subject to yearly budgetary constraints of individual states that may threaten a PPS hospitals ability to continue to provide services to low income persons.

Furthermore, Congress spoke of "eligibility" in the Medicaid proxy and "entitlement" in the Medicare proxy. *See* 42 U.S.C. § 1395ww(d)(5)(F). The Secretary would have this Court conflate eligibility with entitlement. Adjacent provisions utilizing different terms, however, must connote different meanings. To be *entitled* to some benefit means that one possesses the *right* or *title* to that benefit. Thus, the Medicare proxy *fixes* the calculation upon the absolute right to receive an independent and readily defined payment.

By way of contrast, the Medicaid proxy speaks solely of *eligibility*. While Congress intended to refer to the qualification for Medicaid benefits in the calculation of this proxy, Congress could not have intended to fix its calculation on the actual payment of benefits in the state administered program. Had Congress intended that result, it would have also defined the Medicaid proxy in terms of entitlement to state Medicaid payments. Rather, Congress defined the Medicaid proxy with respect to eligibility for and not actual payment of benefits.

Finally, the overarching intent of Congress to provide and supplement the resources available to PPS hospitals is somewhat dispositive of this issue. The operative qualification for this assistance is the servicing of "low income" persons. Congress wanted to ensure the continued operation of these facilities for the benefit of those persons who have no other health care alternative. A Medicaid eligible individual is no less "eligible for medical assistance" on some days simply because his or her state Medicaid program only pays for a fixed number of days. Thus, it is counterintuitive to reason that Congress would exclude from the proxy those days that are not paid for by Medicaid proxy. The Medicaid proxy was intended to supplement and subsidize a PPS hospital's care for low income individuals, and the Secretary's promulgated regulation runs counter to this clear intent by unnecessarily restrict-ing the available subsidy, without foundation in the statute.

### C. The Secretary's Interpretation is Impermissible

In this case, the district court stated that "[t]he parties agree that if the statute is ambiguous, the Secretary can legally choose the interpretation." Joint Appendix at 37. The district court and the parties slightly misstate the law. Note that *Chevron* instructs:

> If, however, the court determines Congress has not directly addressed the *precise question at issue,* the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. *Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.*

(emphasis added). 467 U.S. at 842–43, 104 S.Ct. at 2781–82. Thus, after looking at the legislative history, the Secretary's interpretation must be permissible. We hold that, even if the language of the statute can be deemed silent or ambiguous, the Secretary's construction of the statute is *not* permissible. The legislative history of the Medicaid proxy clearly shows that the Secretary's construction is contrary to that intent expressed by Congress.

As a preliminary matter, the Court takes notice of the Secretary's hostility to the PPS system as documented by the district court in *Samaritan Health Center v. Heckler,* 636 F.Supp. 503 (D.D.C.1985). The *Samaritan* Court simply chronologued the Secretary's unwillingness to promulgate PPS hospital regulations to implement the statutory framework. Prior to PPS, hospitals were paid based on the reasonable cost of providing services to Medicare beneficiaries. The higher costs were incurred by hospitals that serve low income patients because those patients historically require comparatively greater resources in their care. *See Samaritan,* 636 F.Supp. at 508. The *Samaritan* court noted that Congress was motivated to adopt the PPS system because of the in-

creased health care expense for these hospitals.

In accord with this concern, Congress instructed the Secretary to promulgate regulations to implement this new system. Because of the Secretary's failure to promulgate regulations that defined what constituted a disproportionate share facility, the *Samaritan* suit was brought. While the *Samaritan* court ordered the Secretary to "publish a definition of disproportionate share hospitals and identify [them to Congress]," the court did not require the Secretary to make payment adjustments unless it deemed them appropriate. *See id.* at 514–17. The failure to publish the required definition of covered facilities was apparently intended to impede the implementation of the PPS framework. Thus, we find Jewish Hospital's contention that the Secretary was hostile to the concept of disproportionate share adjustment credible and compelling.

In the 1985 COBRA legislation, Congress, however, did mandate that disproportionate share adjustments be made by the Secretary. Both houses of Congress worked to define the provisions of COBRA. In H.R. Report 3128, the legislative body defined "low income patient" as follows:

> The term "low-income patient" means, with respect to inpatient hospital services provided to a patient who was, or is determined to have been, entitled to medical assistance under title XIX with respect to some or all of such services during the hospital stay, and includes such an individual notwithstanding the fact that some or all of such services were actually paid for under this title.

The House thus defined the "proxy" or measure for approximating the disproportionate share as that "percentage of the hospital's total patient days attributable to medicaid patients (including Medicaid-eligible Medicare beneficiaries—Medicare/Medicaid crossovers)." The legislative history provides that the House of Representatives initially endorsed language that would count *all* days attributable to the Medicaid beneficiary, which is undoubtedly the best approximation of the presence of low-income patients.

Additionally, the legislative history makes it clear that the Senate worked primarily to define the low-income patients in terms of Medicare. Senate language described the proxy as "the percentage of a hospital's total medicare part A patient days attributable to medicare patients who are also enrolled in the Federal Supplemental Security Income (SSI) program." Note that the present language of the Medicare proxy is substantially the same as that enacted by the Senate. Therefore, the legislative history of the Senate proceedings for COBRA sheds little light on the interpretation of the Medicaid proxy.

This Court thus finds that the House of Representatives acted to substantially define the Medicaid proxy. Congress intended to include all days attributable to Medicaid beneficiaries in the proxy. Accordingly, an interpretation that is contrary to this intention must be stricken.

The Secretary opined in 42 C.F.R. Part 412.06 that the Medicaid proxy should be calculated using only those hospital patient days which were specifically deemed payable by a state Medicaid program. While the Secretary's attempted limitation on the Medicaid proxy is consistent with its hostility to the PPS system, it fails to implement the will of Congress. The Secretary's interpretation is more restrictive than that intended by Congress and thus runs counter to the statutory language. Therefore, we hold that the Secretary's construction of the Medicaid proxy, as represented by its promulgated regulation is impermissible. Accordingly, we **REVERSE** the district court determination and **REMAND** the case to the Secretary for proceedings consistent with this opinion.

BATCHELDER, Circuit Judge, dissenting.

This case involves complex and sometimes controversial policy issues for hospitals, for Congress, and for the Secretary and the Department of Health and Human Services. It strikes me as quite an easy case for the judiciary to decide, however, the proper decision, in my view, being to keep out. What happened here, in short, is that Congress decided certain hospitals should qualify for additional federal money, but, as is so fre-

quently the case, provided only a rough statutory formula for the Secretary to follow in implementing the subsidy. Following standard notice, comment, and rulemaking procedures, the Secretary implemented a program in accordance with the statute. Congress has not acted to revise the statute or otherwise voice disapproval of the Secretary's action. However, Jewish Hospital thinks it should get more money and argues that the statute Congress enacted specifically and incontrovertibly requires the Secretary to use a different formula than the one adopted. The majority obviously agrees that the hospital deserves more money. But I fail to see, having examined in truly excruciating detail the language and structure of the statute, and then, having found no solid answers there, similarly examined the legislative history, how the majority can accept plaintiff's argument that the *only* "permissible" interpretation of the statute is the one that happens to provide plaintiff with more federal dollars. Since I think the majority has not properly applied the *Chevron* doctrine, or properly interpreted the statute and its legislative history, I respectfully dissent.

# I

Our review of an administrative agency's interpretation and application of a statute Congress has charged it with executing is guided by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.... [However,] if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted). A reviewing court must defer to an agency's legislative rule so long as it is "reasonable," *id.* at 844, 104 S.Ct. at 2782, and "not in conflict with the plain language of

the statute," *Kmart Corp. v. Cartier, Inc.,* 486 U.S. 281, 292, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988). The agency's interpretation must prevail even if other reasonable interpretations exist, including ones the court might have preferred had it been entrusted with the agency's discretion. *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11; *see also Central and S. Motor Freight Tariff Ass'n v. United States,* 843 F.2d 886, 891 (6th Cir.1988) ("Our task ... is not to determine whether we think the [Secretary's] construction is the best construction, but only to determine whether [the] construction was 'sufficiently reasonable.'" (quoting *Crounse Corp. v. ICC,* 781 F.2d 1176, 1183 (6th Cir.), *cert. denied,* 479 U.S. 890, 107 S.Ct. 290, 291, 93 L.Ed.2d 264 (1986))).

This deference has its limits. Courts may invalidate agency adjudication or rulemaking which is "inconsistent with the statutory mandate or that frustrate[s] the policy that Congress sought to implement." *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981). Similarly, where the court determines that, given the intention of Congress to achieve some goal, "'there are compelling reasons that [the agency interpretation] is wrong,'" the court may invalidate the agency's action. *Boettger v. Bowen,* 923 F.2d 1183, 1186 (6th Cir.1991) (quoting *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969)). "[A] reviewing court should not defer to an agency position which is contrary to an intent of Congress expressed in unambiguous terms." *Estate of Cowart v. Nicklos Drilling Co.,* —— U.S. ——, ——, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992); *accord Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985).

## A. The (Not Very) Plain Language of the Statute

In any statutory interpretation question, the starting point and primary guide is the language of the statute, for the actual words of Congress are law.

As the majority notes, the statute as enacted calculates a given hospital's disproportionate share percentage, from which the extra payment is derived, as the sum of:

(I) the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period[1] which were made up of patients who (for such days) were entitled to benefits under part A [Medicare] and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter, and

(II) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter [Medicare], but who were not entitled to benefits under part A, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi). The parties disputed only subsection (II); the hospi-

tal argued that this provision on its face contemplates including in the numerator of the fraction all patient days attributable to persons who, at any time during their stay, qualify for Medicaid reimbursement. The regulation promulgated by HHS includes only the number of patient days "covered," i.e., those patient days actually paid for by the respective governmental programs.[2]

The majority first divines Congress's mandate from the word "eligible," writing that eligible means "capable of receiving" and arguing that Congress should have told us otherwise if it intended a different meaning. Second, the majority finds support for its position in the fact that Congress spoke of "eligibility" in the Medicaid proxy and "entitlement" in the Medicare proxy. But the majority's view reads far too much (and, indeed, the wrong conclusions) into Congress's use of the terms "entitled" and "eligible." Perusing the respective statutory and regulatory language for the Medicare and Medicaid programs, one finds that the Medicare provisions, for reasons not readily apparent, regularly refer to potential beneficiaries under Medicare as being "entitled" to benefits, while the Medicaid laws consistently refer to potential beneficiaries of that program as being "eligible" for benefits. *Compare* 42 U.S.C. § 1395d (Medicare benefits to person consist of "entitlement to have pay-

---

1. The hospital's cost reporting period.

2. 42 C.F.R. § 412.106 calculates the disproportionate patient percentage as the sum of the following:

   (2) *First computation: Federal fiscal year.* For each month of the Federal fiscal year in which the hospital's cost reporting begins, HCFA—
   (i) Determines the number of covered patient days that—
   (A) are associated with discharges occurring during each month; and
   (B) are furnished to patients who during that month were entitled to both Medicare Part A and SSI, excluding those patients who received only State supplementation;
   (ii) Adds the results for the whole period; and
   (iii) divides the number determined under paragraph (b)(2)(ii) of this section by the total number of patient days that—
   (A) are associated with discharges that occur during that period; and
   (B) are furnished to patients entitled to Medicare Part A.
   . . . .

   (4) *Second computation.* The fiscal intermediary determines, for the hospital's cost reporting period, the number of patient days furnished to patients entitled to Medicaid but not to Medicare part A, and divides that number by the total number of patient days in that same period.

   42 C.F.R. § 412.106(b) (1991). It is worth noting that "covered" and "furnished" are the operative words describing the patient days to be counted in this regulation; on its face, the regulation is just as ambiguous as the statute as to whether only paid patient days enter the calculation. However, the Secretary made it clearer (though not crystal clear) in the response to commentary accompanying the final rulemaking, that the phrase "number of patient days" appearing in the statute meant, as the Secretary believed Congress intended and as the regulation would be applied, "days that were paid for by the State's Medicaid program." 51 Fed.Reg. 31460 (1986).

ments made on his behalf") *and* 42 C.F.R. § 400.202 ("Definitions specific to Medicare[:] ... *Beneficiary* means a person who is entitled to Medicare benefits.... *Entitled* means that an individual meets all the requirements for Medicare benefits") *with* 42 U.S.C. §§ 1396a, 1396d (using the term "eligible" to describe Medicaid beneficiaries) *and* 42 C.F.R. § 435.1 ("eligible" used repeatedly; "entitled" or "entitlement" never used).

The majority rests its reasoning in part on the variability in reimbursement that may result if the statutory calculation is dependent on individual state programs since the state programs vary in the levels and duration of coverage they provide for given medical conditions and treatments. There are several problems with this reasoning. First, this does not necessarily distinguish "eligibility" for Medicaid in any meaningful way from "entitlement" to Medicare in the present context, since those persons "entitled" to Medicare may only get part of their hospital expenses reimbursed because the Medicare statutes and regulations impose myriad conditions on such reimbursement. In any event, neither program fully compensates medical treatment in the simple terms of "patient days"; [3] instead, the disease or condition, the treatment, the services required, and other factors all must qualify for coverage separately.

Second, and perhaps more revealing, is the majority's failure to cite any authority for the view that we should reject an interpretation of a federal statute that would be dependent on state law because that might create varying payments from state to state or within a given state from year to year. The majority seems to believe that it is more reasonable to enact federal law that is consistent from state to state. Notwithstanding this legislatively acceptable proposition, if Congress wanted to choose a "less reasonable" route— and it appears that it did—we do not stand as a superlegislature to correct congressional "errors." The majority's reasoning on this issue only reveals that it believes the Secre-

tary should have adopted a more "reasonable" interpretation of the statute, not that the statutory language is plain on its face.

Essentially, the majority's view is that Congress was being redundant—and plainly so—when it added "(for such days)." I do not believe that the Secretary's interpretation suggests for the parenthetical *new* meaning, as the majority asserts, *see* maj. op. at 274–75; the Secretary simply reads the language of the Medicaid proxy in tandem with the Medicare proxy, and neither party disputes that the Medicare proxy includes the identical parenthetical "(for such days)" and means patient days actually paid by Medicare. I believe that the Secretary has a plausible view when she argues that the parenthetical, rather than being superfluous, actually *has* meaning. While the majority might assert that the Secretary is reading something *into* the statute, I believe that the majority is more probably reading something *out of* the statute; after all, the language is in there. Therefore, it hardly seems a fair criticism to say that the Secretary is reading something into the statute—perhaps she is simply *reading* the statute.

In the final analysis, the language of the statute simply reflects the language of the corresponding Medicare and Medicaid statutes and regulations as they refer to those persons who may receive benefits under the two programs and offers no clear answer to the question at bar. Congress thus has not "directly spoken to the precise question at issue" on the face of the statute, and because the language of the statute is ambiguous as to its meaning, we should defer to the Secretary's implementation: "Confronted with an ambiguous statutory provision, we generally will defer to a permissible interpretation espoused by the agency entrusted with its implementation." *Good Samaritan Hosp. v. Shalala,* —— U.S. ——, ——, 113 S.Ct. 2151, 2159, 124 L.Ed.2d 368 (1993); *see also Cen-Tra, Inc. v. United States,* 953 F.2d 1051, 1056 (6th Cir.1992) ("agency interpretation should be accepted by the courts unless it is

---

**3.** Medicare does provide full coverage up to a specified amount for a given number of days of inpatient care. *See* 42 C.F.R. § 409.61(a)(3). However, this would suggest that Medicare

would be a more logical and consistent indigence proxy in terms of "patient days" than Medicaid, contrary to the hospital's arguments.

impermissible and repugnant to the statute or its legislative history").

## B. The Legislative History

While I appreciate the majority's quotation from my dissent in *Brown v. Rock Creek Mining Co.*, 996 F.2d 812, 818 (6th Cir.1993) (Batchelder, J., dissenting), *see* maj. op. at 273–74, the majority pays no more than lip service to the concern I expressed in that case. Having declared that the language of the statute is not ambiguous, the majority goes to the legislative history to find evidence to support its view; not surprisingly, it is able to conclude that it finds some. But the majority's endeavor proves once again why going to the legislative history is rarely illuminating (except to reveal different views and uncertainties in legislative intent) because my painstaking review of the legislative history reveals a different conclusion from the majority's. I therefore somewhat reluctantly enter the labyrinth of the legislative history in this matter to show what I found there.

In 1983, the Congress amended the Social Security laws to reform the manner in which the federal government reimbursed hospitals for treating elderly and low-income persons covered by Medicare. Prior to 1983, the Government paid hospitals the "reasonable cost" of their medical services under a retrospective payment system. *See* 42 U.S.C. § 1395f(b)(1). Not surprisingly, this system enabled hospitals to increase their revenues considerably, and provided no incentive for hospitals to police their expenditures. *See Samaritan Health Ctr. v. Heckler,* 636 F.Supp. 503, 508 (D.D.C.1985) (describing legislative history of PPS). The 1983 amendments established the "prospective payment system" ("PPS"), which established a standard reimbursement amount for a given malady; each disease, condition, operation, etc. is listed in a "diagnosis related group." *Id.* The new system endeavored to create incentives for hospitals to cut costs, since the reimbursement would be the same regardless of the amount it cost the hospital to remedy the patient; hospitals able to treat a given condition for less than the fixed reimbursement amount would get to keep the surplus

money. *Id.; see also* 131 Cong.Rec. S10,931 (daily ed. Aug. 1, 1985) (statement of Sen. Durenberger).

Hospitals complained, however, that poor patients generally cost them more to cure than the fixed payments allowed, since the poor, disabled, and elderly the program sought to insure were in generally worse shape than the typical patient. *See Samaritan Health Ctr.,* 636 F.Supp. at 508; *see also* H.R.Rep. No. 99–241, 99th Cong., 1st Sess. 16 (1985) U.S.Code Cong. & Admin.News pp. 42,594. For this reason, Congress included a provision requiring the Secretary of HHS to make "exceptions and adjustments" to the PPS program "to take into account the special needs ... of public or other hospitals that serve a significantly disproportionate number of patients who have low income or are entitled to [Medicare] benefits." 42 U.S.C. § 1395ww(d)(5)(C)(i); *see also Samaritan Health Ctr.,* 636 F.Supp. at 509; 131 Cong.Rec. S10,929 (daily ed. Aug. 1, 1985) (statement of Sen. Dole). However, the Secretary did not implement this provision by setting up a system to estimate the number of poor patients served in such hospitals and issue payments. Subsequent legislative action requiring the Secretary to "develop a definition of disproportionate share hospitals and to identify such hospitals" resulted in similar inaction by HHS. *See* 131 Cong.Rec. S10,929; H.R.Rep. No. 99–241, 99th Cong., 1st Sess. 16 (1985) U.S.Code Cong. & Admin.News pp. 42,594 ("Despite several mandates in the law, the Secretary continues to fail to implement a disproportionate share adjustment in any meaningful way."). Litigation ensued. *See* 131 Cong.Rec. S10,929; *see also Samaritan Health Ctr.,* 636 F.Supp. at 509.

In 1985, Congress decided again to act, this time in the context of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). In July 1985, a bill was introduced in the House specifically requiring that the Secretary implement a system of payments to hospitals serving a disproportionate share of low-income patients. *See* H.R. 3128, 99th Cong., 1st Sess. (July 31, 1985). That bill provided as follows:

(I) A hospital 'serves a significantly disproportionate number of patients who have low income'. for a cost reporting period if the hospital has a low income patient percentage (as defined in subclause (II)) for that period which equals, or exceeds, 15 percent.

(II) The term 'low income patient percentage' means, with respect to a cost reporting period of a hospital, the percentage of its total number of patient days which are attributable to low income patients (as defined in subclause (III)).

(III) The term 'low income patient' means, with respect to inpatient hospital services provided to a patient, a patient who was, or is determined to have been, entitled to medical assistance under title XIX with respect to some or all of such services during the hospital stay, and includes such an individual notwithstanding the fact that some or all of such services were actually paid for under this title.

*Id.* The House Report accompanying the bill described this provision as "requir[ing]" the Secretary of HHS to "make additional payments" to qualifying hospitals. *See* H.R.Rep. No. 99–241, 99th Cong., 1st Sess. 2 (1985) U.S.Code Cong. & Admin.News p. 579.

The Report described the clauses blockquoted above thus: "The proxy measure for low-income would be the percentage of a hospital's total patient days attributable to medicaid patients (including medicaid-eligible elderly, i.e., medicare/medicaid crossovers)." *Id.* The Report explained that the Ways and Means Committee, in searching for a proxy measure for low income, had considered "available information from the American Hospital Association and other sources" and determined that "medicaid days" would be the best proxy. *Id.* at 17. "The Committee did not want to impose any additional administrative requirements on hospitals or patients.... [T]he proxy measure chosen can easily be implemented for FY 1986." *Id.* Again fleshing out the intent of the bill, the Report explained: "If a patient is eligible for medicaid at any point during his inpatient stay, all days of care attributable to that patient would be counted under the provi-

sion, whether or not actually paid for by the medicaid program." *Id.*

In the Senate, Senators Dole and Durenberger introduced a bill similarly requiring the Secretary to institute a system of providing additional payments to hospitals serving a disproportionate share of indigents. The bill was labeled "Indirect Graduate Medical Education Reimbursement and Disproportionate Share Hospitals," *see* S. 1606, 99th Cong., 1st Sess. (Aug. 1, 1985) (text reproduced in 131 Cong.Rec. S10,930 (daily ed. Aug. 1, 1985)), and provided for a payment to hospitals whose "percentage under clause (iii) is 30 percent or greater." Clause (iii) provided:

(iii) The percentage for a hospital is the fraction (expressed as a percentage) equal to the sum of—

(I) the fraction, the numerator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were enrolled under part B of this title pursuant to an agreement under section 1843, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under part A of this title; plus

(II) the fraction, the numerator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were eligible for medical assistance under title XIX of this act, other than individuals enrolled under part B of this title pursuant to an agreement under section 1843, and the denominator of which is the total number of such hospital's patient days for the fiscal year.

131 Cong.Rec. S10,930 (daily ed. Aug. 1, 1985).

In introducing the bill, Sen. Dole described its "primary purpose" as "to begin working toward a more accurate and equitable Medicare reimbursement for hospitals that ... serve a large portion of low income elderly." 131 Cong.Rec. S10,928 (statement of Sen. Dole). His sentiments mirrored those of the House in introducing H.R. 3128:

[Congress] charged the Secretary of Health and Human Services with the responsibility of providing for exceptions and adjustments to hospital payment amounts to take into account the special needs of public or other hospitals that serve a disproportionate share of poor elderly patients. To date the Secretary of Health and Human Services, however, has not provided for such a disproportionate share adjustment.

*Id.* at S10,929. Senator Dole recounted Congress's failed attempts to get the Secretary to devise a payment plan, and the litigation that followed. *Id.* He also noted studies which had concluded that "higher costs do occur as a result of the presence of large numbers of Medicare or low income patients." *Id.*

He then explained in some detail how the provision would work.

First, hospitals larger than 100 beds serving a large portion of low-income individuals or those participating in Medicare, will be eligible to receive an adjustment calculated on the basis of the proportion of low-income elderly and the proportion of Medicaid patients they serve. In order to qualify for an adjustment, a hospital must have a specified proportion of its days accounted for by either dually eligible Medicare and Medicaid patients or nonaged Medicaid patients....

. . . .

Third, we require the Secretary to develop data files that will be instrumental in our ability to further target the adjustment in year two of this bill. Specifically, we wish to construct a method which targets the adjustment on institutions who serve a large number of low-income Medicare beneficiaries. We continue to believe that Medicare is not intended to subsidize access of nonelderly poor to hospital care.

There is broad consensus that under the current system at [sic] some hospitals are experiencing unusual hardships while others are receiving windfall profits. The disparity should not be allowed to continue if we can find an equitable method of allocating these funds.

131 Cong.Rec. at S10,929 (statement of Sen. Dole).

Senator Durenberger then took the floor and added the following comments:

I chaired a hearing of the Finance Committee's Health Subcommittee on the disproportionate share issue earlier this week. The testimony from the hearing convinced me that Congress should adopt an adjustment, albeit crude, and put more pressure on the Secretary to develop a more appropriate adjustment.

. . . .

S. 1606 ... provides an adjustment to per case payments for hospitals which serve a sufficient level of poor Medicare beneficiaries. The proxies used to determine that level are not perfect by any means.

The bill gives direction to the Secretary to do better on [a?] new proxy by fiscal year 1987. And, the entire provision will sunset after fiscal 1987. The sunset is important. It will compel the Congress to revisit the issue at that time and access the adjustment in light of progress on developing a severity index and the availability of better data generally.

131 Cong.Rec. S10,931 (statement of Sen. Durenberger).[4] S. 1606 was referred to the Senate Finance Committee, but died there.[5]

Apparently[6] H.R. 3128 was passed on October 31, 1985, with the disproportionate share provision intact. In the Senate, however, the bill was amended. The Senate

---

**4.** According to his comments, Senator Durenberger based the drafting of S. 1606 largely on the hearing. The transcript and record of that hearing is entitled *"Economic Problems Facing Hospitals Serving the Poor and Elderly,"* Hearing before the Subcommittee on Health of the Senate Committee on Finance, S.Hrg. 99–342, 99th Cong., 1st Sess. (July 29, 1985) [hereinafter *Durenberger Hearing*].

**5.** However, it was to be reincarnated, as I shall describe in short order.

**6.** Since the legislative history of the disputed provision is bound up in the legislative history of COBRA, *see* Cong. Index (CCH), 99th Cong., 35,054, the exact course of events in its enactment is difficult to ascertain.

version transplanted subsection (I) of S. 1606 (herein, the miraculous rebirth) verbatim into the legislation to serve as the low income patient proxy. *See* 131 Cong.Rec. S15,510 (daily ed. Nov. 14, 1985). In December, the bill was hashed out in conference, and the House Committee of Conference issued a Conference Report outlining the differences between the House and the Senate proposals [7] on various issues, including disproportionate share payments. *See* H.R.Rep. 99-453, 99th Cong., 1st Sess. (Dec. 19, 1985). According to the report, the House definition of low income patients for the purposes of the disproportionate share provision was unchanged from before: "The proxy measure for low income would be the percentage of a hospital's total inpatient days attributable to medicaid patients (including medicaid-eligible medicare beneficiaries—medicare/medicaid crossovers)." *Id.* at 459. The Report described the parallel provision in the Senate amendment thus: "The proxy measure for low income patients would be the percentage of a hospital's total medicare part A patient days attributable to medicare patients who are also enrolled in the Federal Supplementary Security Income (SSI) program." *Id.* at 460. The Conference Report explained the agreement reached: "The percentage of low income patients will be defined as the total number of inpatient days attributable to Federal Supplementary Security Income beneficiaries divided by the total number of medicare patient days, plus the number of medicaid patient days divided by total patient days." *Id.* at 461. When the bill finally passed, however, on March 20, 1986, and became law on April 7, 1986, the entire disproportionate share payment provision reflected almost exactly the same language that had originally appeared in Senators Dole and Durenberger's S. 1606.

According to the hospital, even though the language used in the final version of subsection (II) was not the language of the original House measure, the final version reflects "ex-actly the same number of hospital days" as did the original House measure. The Secretary for her part, concedes that the language of the original House measure did encompass all patient days attributable to Medicaid eligible patients whether or not such days were paid by Medicaid, but emphasizes that that language was not the language of the final version. Logic suggests that where Congress substitutes substantive language in a final version of a bill, it intends some substantive change in the operation of the law, and the hospital has brought to our attention no evidence of or authority for its assertion to the contrary. Since the final language of subsection (II) is in all material respects substantially identical to the original language of S. 1606, it would seem that the legislative history behind that provision, rather than the legislative history of the abandoned H.R. 3128 provisions, none of which made it to the final version, should be the court's primary guide.[8]

The properly considered legislative history, then, includes the comments of Senators Dole and Durenberger introducing S. 1606, and the content of the hearing on the disproportionate share problem, which Senator Durenberger chaired. Like the legislative history leading up to the Conference Report, however, these records provide no clear support for the majority's position. The record of the *Durenberger Hearing* is lengthy and extensive; it reveals a wealth of varied expert opinion on the problem of disproportionate share hospitals and the PPS system. Most witnesses recognized that the Congress could, at its discretion, employ one or a combination of several low-income patient proxies on which the PPS adjustment could be based. *See, e.g., Durenberger Hearing* at 28 (background paper), 78 (statement of Nancy M. Gordon), 104 (statement of Dr. Stuart Altman), 127–29 (statement of Jack Owen). However, the witnesses agreed on no clear policy preference; neither did any of the

---

7. The Conference Report made no mention of S. 1606, but only to the Senate amendment of the House bill.

8. Even if the case were that the compromise language in the Conference Report came to some clear conclusion on the exact scope of the low income patient proxy, the adoption of the S. 1606 language in the final version of the bill would preclude relying on the Conference Report as a persuasive indicator of Congress's ultimate intent.

Senators participating clearly indicate his preference, including Senator Durenberger.

The only clear message one may derive from the hearing record, and from the comments of Senators Dole and Durenberger, is that the Congress required the Secretary of HHS to implement *some* system by which the Government would make an actual payment to PPS-participating hospitals burdened with disproportionate shares of indigents. *See* 131 Cong.Rec. S10,929 (statement of Sen. Dole) ("To date the Secretary of Health and Human Services has not provided for ... a disproportionate share adjustment."); *id.* at S10,931 (statement of Sen. Durenberger) ("The Congress [has] instructed the Secretary to make provision in Medicare's payments for the hospitals which treat a disproportionate share of the poor. She has chosen to ignore this directive.... Our answers ... may be less than accurate or adequate. But, at least they will put in law the clear congressional direction that the Secretary has argued is currently not available."); *Durenberger Hearing* at 119 (statement of Jack Owen) ("[T]he question is not whether there should be an adjustment, but how.... [W]e have been frustrated over the HHS failure to implement any disproportionate share provision in the law to date.").

Beyond requiring this implementation, the relevant legislative history reflects Congress's intent to point the Secretary toward those criteria that ought to be factors in the low-income proxy calculation. The language of the statute as approved, for example, clearly excludes from its calculus data on "uncompensated care" such as "charity care," that is, care provided for free by a given hospital on its own nickel, and "bad debt," that is, hospital stays for which the bill has not been paid. The Senate Health Subcommittee recognized these two factors as in some sense representing care attributable to indigent patients, but these factors were evidently rejected. *See Durenberger Hearing*

at 119, 128–29 (statement of Jack Owen), 154–55 (statement of Dr. James Morgan).

The legislative history (and this would now include the Conference Report, which is not to the contrary on this point) reveals that Congress intended to push the Secretary of HHS towards rapid implementation by specifying the categories of low-income indicators upon which the Secretary should base the low-income proxy. However, the legislative history for the proxy does not indicate how broad Congress (or, indeed, any single member) intended the scope to be *within* those categories. The court must give Congress's words their "ordinary, contemporary, common meaning," *Fagner v. Heckler,* 779 F.2d 541, 543 (9th Cir.1985) (citing *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979)), and "give effect, if possible, to every word Congress used," *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). Read thus, the statute requires the proxy to be based on the percentages of "Medicare patient days" and "Medicaid patient days" found in given categories of hospitals. As noted before, these phrases are ambiguous as to whether they include all patient days attributable to patients who at some time were eligible for either program, as the hospital contends, all patient days paid for by either program, as the Secretary contends, or some other subset of patient days. The legislative history belies the very basis of the majority's argument, that Congress intended that the Secretary's formula reflect the number of patient-days attributable to indigent patients, not merely the number of patient-days paid for by government insurance, or some other, less accurate, proxy.

Thus, the legislative history behind S. 1606 strongly suggests that the bill's proponents, having mandated that the Secretary finally act, recognized that they had left unfinished the task of estimating hospitals' indigent patient burdens, and left ample room for the Secretary to define the proxy more precisely, employing the resources of HHS.[9] As Sena-

9. It would appear that, in defending the regulation against various commenters, the Secretary misinterpreted the legislative history. As is the hospital, the Secretary apparently was unaware that the final language of the provision had its

pedigree in S. 1606, and that the final language substituted for the compromise language appearing in the Conference Report did not appear out of thin air. Thus, in attempting to divine the meaning of the provision from the differences in

tor Durenberger stated, "Our answers ... may be less than accurate or adequate.... The proxies used to determine [the] level [of poor Medicare beneficiaries] are not perfect by any means." 131 Cong.Rec. at S10,931. And as Senator Dole noted, "[w]hile the bill we offer brings us closer to our stated purpose, we recognize that it is only our first step." *Id.* at S10,928. Senator Durenberger perhaps summarized the legislative background most accurately: "All of the proxies that we have been looking at appear to be, at best, crude." *Durenberger Hearing* at 101.

## C. Reasonableness of the Secretary's regulation

The Supreme Court has specified the standard of administrative review in a case such as this, where Congress has left the door ajar, if not wide open, for the Secretary charged with executing its statutory directive. "Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782 (footnote omitted). The Congress may leave conflicts in policy, particu-

larly those which require specialized knowledge and study, for an administrative agency to resolve; such delegations demand deference. *Id.* at 844–45, 104 S.Ct. at 2782–83.

"If [the agency's] choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."

*Id.* at 845, 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

Reviewed under the *Chevron* standard in light of the language of the statute and its legislative history, the Secretary's choice to use as a low-income proxy those patient-days for which either the Medicare or Medicaid program has paid is a reasonable accommodation that Congress would have (and apparently has) sanctioned. The legislative history, including that of the House provisions, contains frequent references to the use of "Medicare days" or "Medicaid days" as a proxy; unfortunately, these terms are just as ambiguous as to their scope in the context of the legislative history as they are in the context of the resulting statute.[10] The sena-

---

wording between the language of the Conference Report and the final language, the Secretary thought Congress specifically intended to limit the proxy to paid patient-days.

> The substitution of the term "number of medicaid patient days" in the Conference agreement for the previous term [used in the House bill] "attributable to medicaid patients" suggests that Congress intended to adopt the definition as we currently understand it (that is, only hospital days covered by Medicaid should be included in the numerator). We believe that Congress consciously changed the focus of the Medicaid definition from the number of days that may be attributable to individuals eligible for Medicaid to the actual "number of Medicaid patient days" (that is, days that were paid for by the State's Medicaid program).

51 Fed.Reg. 31,460 (Wednesday, Sept. 3, 1986) (Secretary's response to commenters). The Secretary makes a quantum leap from "Medicaid patient days" (which the Secretary now argues is probably an ambiguous term) to "paid" inpatient days; neither the legislative history nor, indeed, the Secretary's own Medicaid regulations clearly define Medicaid "patient days" as necessarily meaning "paid" days. However, it would appear that *Chevron* and its progeny do not require

the court, in reviewing the Secretary's promulgation of a final rule, to peer past the sausage and into the factory. Under *Chevron,* so long as the regulation comports reasonably with the enabling statute, it must be upheld.

**10.** *Compare* H.Rep. No. 99–241, Part 1 at 17 (July 31, 1985) U.S.Code Cong. & Admin.News p. 595 (explaining that House provision using "Medicaid days as a proxy" included all days attributable to patients eligible for Medicaid at any time during their hospital stay, regardless of whether Medicaid paid) *with Durenberger Hearing* at 86 (statement of Nancy M. Gordon) (suggesting proxy be "the number of nonMedicare patients for whom Medicaid is the primary payer") *and id.* at 93 (table attached to Gordon report using "Medicare inpatient days" and "inpatient days of Medicaid buy-ins" as elements of proxy options); *see also Durenberger Hearing* at 104 (statement of Dr. Stuart Altman) (recommending that proxy be based, in part, on "the Medicaid population in a hospital" adjusted "to account for the fact that in some States Medicaid pays a relatively small percentage of the low-income population's bill").

tors who drafted the statutory language apparently considered using only paid days as a low-income proxy, but neither rejected this proxy nor expressly incorporated it in the statute; thus a regulation promulgated by the Secretary that adopts this proxy "is consistent with the language of the statute." *Kmart Corp. v. Cartier*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). Given Congress's overriding concern that the Secretary implement some form of additional payment to the hospitals it deemed overburdened by the poor, the majority cannot reasonably believe that the Secretary, who has unquestionably implemented a payment scheme, did so in a manner "inconsistent with the statutory mandate" in such a way as to "frustrate the policy that Congress sought to implement." *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981). The law requires no more for the Secretary to prevail.

It is worth noting the Secretary's persuasive point that Congress has not seen fit to change this statutory provision, although it has revised other elements of the prospective payment system. *See, e.g.*, Pub.L. No. 101–508, § 4001, 104 Stat. 1388 (1990). Congress has been kept up to date on the progress of the Secretary's implementation of the disproportionate share payment scheme. *Id.* As the Secretary correctly argues, courts have considered congressional inaction in the wake of disputed agency regulation as evidence of congressional approval of the agency's interpretation and execution of the law. "[C]ongressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Young v. Community Nutrition Inst.*, 476 U.S. 974, 983, 106 S.Ct. 2360, 2366, 90 L.Ed.2d 959 (1986). In the several years that the Secretary's formula has been used to calculate supplementary payments to hospitals, Congress could well have expressed any disapproval it had with the regulations. Since it did not, I think it all the more inappropriate for the courts to step in to "fix" a policy Congress evidently does not believe is broken.

The hospital brands the regulation as "totally irrational" since it "ironically ... rewards hospitals in states whose Medicaid programs cover more [patient] days than others," [11] and the majority expresses hesitancy in adopting a view of a federal statute that would mean such statute was integrally linked to state law that could be "readily altered by state legislative fiat," *see* maj. op. at 274–75. And although the majority does not express its concern in terms of constitutional guarantees, the hospital did, arguing that varying payments from state to state would violate the Equal Protection Clause. But where suspect classifications do not enter the picture, Congress has broad discretion in regulating economics and social welfare, even where a program has different effects on different persons or groups. *See Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Id.* (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)).

> So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straitjacket. The very complexity of the problems suggests that there will be more than one constitutionally permissible method of solving them.

*Jefferson v. Hackney*, 406 U.S. 535, 546–47, 92 S.Ct. 1724, 1731–32, 32 L.Ed.2d 285 (1972). Where a governmental welfare scheme depends partly on individual state participation, the differences in levels of benefits among the states resulting from each state's legislative choices does not violate the Constitution's equal protection guarantees. *Id.*

## II

For the reasons I have explained, I believe the decision of the District Court upholding

---

11. I cannot help but note that if irony in policymaking rendered statutes unconstitutional, our opinions would be considerably shorter, albeit more numerous.

the Secretary's regulation and application of the regulation should be affirmed. I respectfully dissent.