**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PORTLAND ADVENTIST MEDICAL
CENTER; OREGON HEALTH SCIENCES
UNIVERSITY; ASANTE dba Rogue
Valley Medical Center; SACRED
HEART MEDICAL CENTER; SALEM
HOSPITAL; TUALITY HEALTHCARE
dba Tuality Community Hospital;
LEGACY MT. HOOD MEDICAL
CENTER; LEGACY GOOD SAMARITAN
HOSPITAL & HEALTH CENTER;
MCKENZIE-WILLAMETTE HOSPITAL,
   *Plaintiffs-Appellees,*

   v.

TOMMY G. THOMPSON, Secretary,
Department of Health & Human
Services,
   *Defendants-Appellants.*

No. 03-35612

D.C. No.
CV-02-00289-
REJ/JJ

OPINION

Appeal from the United States District Court
for the District of Oregon
Robert E. Jones, District Judge, Presiding

Argued and Submitted
December 8, 2004—Portland, Oregon

Filed March 2, 2005

Before: Thomas G. Nelson and Johnnie B. Rawlinson,
Circuit Judges, and William W Schwarzer,*
Senior District Judge.

*The Honorable William W Schwarzer, Senior United States District
Judge for the Northern District of California, sitting by designation.

2429

Opinion by Judge Schwarzer

## COUNSEL

August E. Flentje, Attorney, Appellate Staff Civil Division, Department of Justice, Washington, D.C., for the appellant.

Lisa Dobson Gould and Sanford E. Pitler, Bennett Bigelow & Leedom, P.S., Seattle, Washington, for the appellees.

## OPINION

SCHWARZER, Senior District Judge:

We must decide whether the Secretary of the Department of Health and Human Services correctly denied reimbursement to plaintiff hospitals for services to certain low-income populations based on his interpretation of the Medicare statute's Disproportionate Share Hospital (DSH) calculation. The district court held that the Secretary's interpretation of the statute governing reimbursement violated the text and intent of the statute and granted plaintiffs' motion for summary judgment. We agree with the district court and affirm for the reasons stated below.

## DISCUSSION

## I.   THE REGULATORY FRAMEWORK

Under the Medicare program, Title XVIII of the Social Security Act, the federal government reimburses hospitals for certain medical services provided to eligible individuals. 42

U.S.C. §§ 1395-1395ggg. Under Title XIX of the Act, the Medicaid program, the federal government provides funds to states to offset some of the expense of furnishing medical services to low-income persons. *Id.* §§ 1396-1396v; 42 C.F.R. § 430. To receive federal assistance, a state must submit a plan for approval by the Secretary. 42 U.S.C. § 1396a. Only expenditures made under an approved state plan are eligible for matching federal payments. *See* 42 U.S.C. §§ 1315, 1396, 1396c. While some federal requirements apply to these plans, states have considerable "discretion to determine the type and range of services covered, the rules for eligibility, and the payment levels for services." *Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261, 1262 (9th Cir. 1996) (citation omitted).

Section 1115 of the Social Security Act authorizes the Secretary to approve experimental or demonstration projects to encourage states to adopt innovative programs that are likely to assist in promoting the objectives of Medicaid, among other social programs. 42 U.S.C. § 1315(a). For these experimental projects, the Secretary is authorized to waive compliance with the general federal requirements for Medicaid state plans set out in § 1396a. Nevertheless, the "costs of such project[s] . . . shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State [Medicaid] plan." *Id.* § 1315(a)(2). Experimental projects may provide medical assistance to individuals who could be eligible for Medicaid even without a waiver as well as to individuals who would not be eligible. *See, e.g.*, Interim Final Rule, Medicare Program; Medicare Inpatient Disproportionate Share Hospital (DSH) Adjustment Calculation, 65 Fed. Reg. 3136, 3136-37 (Jan. 20, 2000). The latter group, who become eligible for services paid for with Medicaid funds by reason of the Secretary's waiver of particular requirements under § 1115, are known as "expansion populations" or "expanded eligibility populations." *Id.*

Federal reimbursement of hospitals' operating costs under Medicare occurs under the Prospective Payment System (PPS). 42 U.S.C. § 1395ww(d). This system bases reimbursement on a "predetermined amount that an efficiently run hospital should incur for inpatient services." *Legacy Emanuel*, 97 F.3d at 1262. In 1983, Congress found that providing services to low-income patients may cost medical centers more than is provided for by this scheme and, accordingly, Congress directed the Secretary to make additional payments to hospitals that serve "a significantly disproportionate number of low income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). A designated fiscal intermediary calculates these disproportionate share payments on the basis of the hospital's "disproportionate share percentage." *Id.* § 1395ww(d)(5)(F)(vi). In part, this calculation requires a fiscal intermediary to determine the proportion of low-income patient days in the Medicare population the hospital served, a proportion known as the Medicaid fraction or Medicaid proxy. *Id.* § 1395ww(d)(5)(F)(vi)(II);[1] *see also Legacy Emanuel*, 97 F.3d at 1263 & n.2 (explaining the calculation of the disproportionate share percentage).

Under the regulation in effect from 1991 through 1998, 42 U.S.C. § 412.106(b)(4), the Secretary included in the Medicaid fraction all patient days during which an individual was entitled to Medicaid, but interpreted the rule to exclude days of patients who were Medicaid eligible but for which Medicaid payments were not actually made.[2] *See* Medicare Program; Changes to the Hospital Inpatient Prospective Payment

---

[1]The statute provides that this is a

> fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [title] XIX [that is, Medicaid], but who were not entitled to benefits under part A of this [title] [that is, Medicare], and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

[2]A state plan might, for instance, cap the number of days for which it would provide payment for services rendered to a Medicaid-eligible patient, resulting in some days of actual care for which a hospital would not be reimbursed under a state plan. *See Legacy Emanuel*, 97 F.3d at 1263.

Systems, 63 Fed. Reg. 40,954, 40,984-85 (July 31, 1998). In 1998, following adverse court rulings, *e.g.*, *Legacy Emanuel*, 97 F.3d 1261, the Secretary amended this rule to provide for computation of DSH reimbursements on the basis of patients' eligibility for Medicaid assistance, regardless of actual payment. *See* 42 C.F.R. § 412.106(b)(4)(i).

Despite this clarification, calculation of hospitals' DSH reimbursements continued to lack uniformity. As the Secretary acknowledged in a Program Memorandum issued in December 1999, some fiscal intermediaries' calculations included days attributable to patients in § 1115 expanded eligibility populations but not eligible for Medicaid under the federal statutory guidelines; other fiscal intermediaries' calculations did not include expansion population patient days. The Secretary issued an Interim Final Rule on this subject in January 2000. 65 Fed. Reg. 3136 (Jan. 20, 2000). This rule stated that with respect to the preceding period, the Medicaid fraction had not included patients in expanded eligibility populations. *Id.* at 3136. It went on to state, however, that after January 20, 2000, the DSH provision would be interpreted to permit hospitals to "include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act." *Id.* at 3136, 3139; *see also* 42 C.F.R. § 412.106(b)(4)(ii) (codifying the interim final rule). The Secretary explained:

> [W]e believe allowing hospitals to include the section 1115 expanded waiver population in the Medicare DSH calculation is fully consistent with the Congressional goals of the Medicare DSH adjustment to recognize the higher costs to hospitals of treating low income individuals covered under Medicaid. Therefore, inpatient hospital days for these individuals eligible for Title XIX matching payments under a section 1115 waiver are to be included as Medicaid days for purposes of the Medicare DSH adjustment calculation.

65 Fed. Reg. at 3137.

The Secretary characterized this rule as a change in policy. 65 Fed. Reg. at 3136. However, the rule also acknowledged that because of differences in fiscal intermediaries' approaches to calculation of DSH reimbursement shares, "many hospitals in States with approved section 1115 expansion waivers have [already] been receiving Medicare DSH payments reflecting the inclusion of expansion population patient days." *Id.* The rule was silent as to whether the Secretary would seek reimbursement from those hospitals that had received DSH payments prior to January 2000. Plaintiffs were among the hospitals that *excluded* expansion population patients from their pre-January 2000 DSH calculations.

## II.   STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 639 (9th Cir. 2003). We also review de novo questions of statutory interpretation. *Brower v. Evans*, 257 F.3d 1058, 1065 (9th Cir. 2001).

We are to construe the DSH statute and assess the Secretary's interpretation of it following the standards set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). We ask first "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If it has, our inquiry ends; we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. But if "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

## III.   THE MEDICAID FRACTION

This appeal turns on the interpretation of the Medicaid fraction provision in the DSH statute, which states, in relevant part, that the

"disproportionate patient percentage" [includes] . . . [t]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were *eligible for medical assistance under a State plan approved under [title] XIX* . . . but who were not entitled to benefits under part A of this [title] [Medicare], and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). We must decide whether this provision *requires* the Secretary to regard low-income individuals who receive medical services under a demonstration project approved pursuant to a § 1115 waiver—expansion population patients—as "persons eligible for medical assistance under a State plan approved under title XIX."

### A.  Text and Purposes of the DSH Provision

The Secretary contends that the DSH provision is at least ambiguous, entitling his interpretation to deference. He points to the statutory language that covered patients must have been "eligible for medical assistance under a State plan" and argues that § 1115 patients, who receive assistance only because he has waived their compliance with the Act's general requirements, may be regarded as not "eligible for medical assistance under a State plan."[3]

Plaintiffs in turn argue, and the district court held, that the

---

[3]The Secretary also argues that a § 1115 plan is approved under Title XI, rather than Title XIX. This argument is unpersuasive. The demonstration project provision is codified in Title XI, but this does not mean that a project is approved "under" Title XI. Rather, the Secretary is directed to approve it according to its conformity with the objectives of Title XIX. *See* 42 U.S.C. § 1315(a)(1).

statutory scheme is unambiguous and supports only the conclusion that expansion populations eligible under § 1115 receive medical assistance "under a State plan." We agree.

**[1]** In the demonstration project statute, Congress expressly tied § 1115 waivers to approved state Medicaid plans by providing that the costs of such demonstration projects "shall . . . be regarded as expenditures under the State plan." 42 U.S.C. § 1315(a)(2)(A). Thus, the statute defines low-income individuals receiving medical assistance under a § 1115 plan as receiving medical assistance under a Title XIX plan. *Id.* As a result, because expansion population patients are capable of receiving Title XIX assistance, they must be regarded as "eligible" for it. *See, e.g.*, *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 274 (6th Cir. 1994) (" '[E]ligibility' refers to the 'qualification' for benefits or the capability of receiving those benefits.").

**[2]** This understanding finds support in our discussion of the purposes of the DSH provision in *Legacy Emanuel.* 97 F.3d at 1265-66. There, we held that all treatment days for qualifying low-income patients must be included in the Medicaid fraction of the DSH calculation, whether or not the costs of those patients' treatment had actually been paid by Medicaid. We observed:

> Congress's "overarching intent" in passing the disproportionate share provision was to supplement the prospective payment system payments of hospitals serving "low income" persons. The DSH provision directs the Secretary to provide an additional payment to hospitals serving a disproportionate number of low-income patients. . . . *Congress intended the Medicare and Medicaid fractions to serve as a proxy for all low-income patients*.

97 F.3d at 1265 (emphasis added) (citations omitted). Other circuits have reached similar conclusions. *See, e.g.*, *Cabell*

*Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984, 991 (4th Cir. 1996) (following *Legacy Emanuel*); *Jewish Hosp.*, 19 F.3d at 275 ("Congress wanted to ensure the continued operation of these facilities for the benefit of those persons who have no other health care alternative.").

**[3]** The situation presented in *Legacy Emanuel* is analogous and our conclusion there foreshadows the correct result in the present case. Here, as there, we are required to decide whether the statute permits an interpretation that would deny hospitals the benefit of the DSH formula with respect to parts of the low-income populations they serve.[4] In *Legacy Emanuel*, we noted that "[p]atients meeting the statutory requirements for Medicaid do not cease to be low-income patients on days that the state does not pay Medicaid inpatient hospital benefits." 97 F.3d at 1266. So here, patients receiving medical assistance under a § 1115 waiver program do not cease to be low-income patients by reason of being in the expansion population.[5] Given the intent behind the DSH provision, they must be included in the Medicaid fraction.

The district court correctly concluded that Congress clearly expressed its intent that expansion populations be included in

---

[4]In *Legacy Emanuel*, we refused to permit the Secretary to exclude from the DSH calculation low-income patients who were eligible but had not been paid for by Medicaid. *See* 97 F.3d at 1266. In this case, the Secretary would exclude low-income patients who are eligible for Title XIX funds by virtue of a § 1115 waiver.

[5]Further evidence of Congress's intent regarding inclusion of expansion population patients is found in the Balanced Budget Act of 1997, which refers to

> individuals who receive medical assistance under the State plan under title XIX of [the Social Security] Act and are not entitled to benefits [under Medicare] (*including individuals . . . who receive medical assistance under [Title XIX] pursuant to a waiver approved by the Secretary under section 1115 . . .*).

Pub. L. No. 105-33 § 4403(b), 111 Stat. 251, 399 (1997) (emphasis added).

DSH calculations. We therefore need not inquire whether the Secretary's interpretation of the provision is reasonable. *See Chevron*, 467 U.S. at 863.

### B.   Scope of the Secretary's Discretion Under § 1115

The Secretary also contends that § 1115 itself provides authority for excluding expansion populations from the DSH calculation. He argues that the expansion populations' eligibility for medical care derives not from Title XIX but from the demonstration statute, § 1115, which is part of Title XI. This argument rests on the premise that the Act contemplates two types of medical assistance: one under Title XIX state plans and another under § 1115 waivers. The Secretary further argues that the language of § 1115 confers on the Secretary discretion to choose to characterize demonstration project expenditures as Title XIX expenditures for purposes of Medicaid reimbursement but not for purposes of DSH calculation. According to the Secretary, this discretion also confirms the difference between the two types of medical assistance. We reject these arguments.

[4] Section 1115 does not establish a new, independent funding source. It authorizes the Secretary to "waive compliance with any of the requirements of" a series of provisions of the Social Security Act in approving demonstration projects.[6] 42 U.S.C. § 1315(a)(1). Neither this provision nor any other

---

[6]The cross-referenced provisions are 42 U.S.C. §§ 302 (setting forth requirements for approval of state plans for "old-age assistance"), 602 (setting forth restrictions on states' use of federal grants under Social Security Act), 654 (setting forth requirements for approval of state plans for "child and spousal support"), 1202 (setting forth requirements for approval of state plans for "aid to the blind"), 1352 (setting forth requirements for approval of state plans for aid to the "permanently and totally disabled"), 1382 (setting forth restrictions on and definitions of "eligibility" for benefits under the Social Security Act), 1396a (setting forth requirements for approval of state plans for "medical assistance," i.e., Medicaid).

authorizes appropriation of any sums for purposes of funding projects approved under § 1115. When Congress has established separate funding sources, it has done so with specific language, *see, e.g.*, 42 U.S.C. §§ 301 (authorizing appropriations for state "old-age assistance" plans), 1396 (authorizing appropriations for Medicaid payments to states); and it has done the same with respect to demonstration projects. *See* 42 U.S.C. § 300z-9 (authorizing appropriations for adolescent family life demonstration projects). Because Congress did not incorporate authorizing language in § 1115, it clearly did not intend § 1115 to be a funding source.

**[5]** Nor does this section confer on the Secretary discretion to interpret it as creating a funding source. Indeed, § 1115 constrains the Secretary's discretion in a number of ways. As noted above, the Act expressly states that the costs of § 1115 demonstration projects "*shall* . . . be regarded as expenditures under the State plan . . . approved under [Title XIX]." 42 U.S.C. § 1315(a)(2)(A) (emphasis added). Use of the term "shall" creates a mandatory equivalence between expenditures under a § 1115 project and Title XIX expenditures. *See, e.g.*, *Hanson v. Marine Terminals Corp.*, 307 F.3d 1139, 1142 (9th Cir. 2002) (interpreting "shall" as a "mandatory" term). Section 1115 also unambiguously requires the Secretary, as a condition of approval of a demonstration project, to find that the project "is likely to assist in promoting the objectives of [Title] . . . XIX." *Id.* § 1315(a). It is true that § 1115 also provides for demonstration projects designed to serve populations other than low-income medical patients, such as children and the unemployed. *See, e.g.*, *id.* §§ 1315(b), 1315(c). But § 1115 also clearly requires that such projects be tied to and fully consistent with those portions of the Act creating programs for those specific populations. The provision's breadth and flexibility in this regard cannot be read as conferring discretion on the Secretary to interpret § 1115 as establishing a new, freestanding assistance scheme.

The Secretary also points to language in § 1115 that, he argues, gives him authority to determine "the extent" and "the period" for which the costs of benefits provided under a demonstration project shall be regarded as expenditures under a state plan. *See* 42 U.S.C. § 1315(a)(2)(A). This argument misconstrues the statute's "extent" and "period" language, which clearly refers to the scope and duration of the demonstration project and identifies these as matters left to the Secretary. *Id.* § 1315(a)(1) (permitting the Secretary to waive compliance with certain statutory requirements "to the extent and for the period he finds necessary to enable such State . . . to carry out such project"). It is true that the statute also provides that the costs of an approved project "shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan." *Id.* § 1315(a)(2)(A). But this "extent" and "period" language, following and modifying the mandatory term "shall," plainly also refers to the lifespan of a project—the period during which the equivalence between § 1115 and Title XIX expenditures is required. No other placement of the "extent" and "period" phrase would unambiguously convey this meaning, which is consistent with the plain meaning of the rest of § 1115.[7] The Secretary's interpretation, in contrast, would have us read this portion of § 1115 as though it provided that costs of a project "shall be regarded, to the extent and for the period prescribed by the Secretary, as expenditures under the State plan." We decline to rewrite the statute.[8]

---

[7]Placement of the language at the end of the provision ("shall be regarded as expenditures under the State plan, to the extent and for the period prescribed by the Secretary") while supporting the same interpretation, would introduce an ambiguity.

[8]We note in addition, simply as further illustration of the clarity of the statute's language, that the Secretary himself has previously recognized the limited nature of his discretion under the "extent" and "period" language of § 1115. In 1994 he maintained that "the 'extent and period' inquiry [in 42 U.S.C. § 1315(a)(1)] is simply a nondiscretionary, rote review of which federal statutes conflict with the experiment and must be

**[6]** The plain language of the statute requires us to conclude that § 1115 does not confer on the Secretary discretion to characterize expenditures as Title XIX (Medicaid) expenditures for some purposes and not for others. On the contrary, while the provision gives the Secretary discretion in *approving* projects, the provision *requires* the Secretary to regard expenditures under § 1115 projects designed to assist low-income patients as Title XIX expenditures for the duration of such projects, and therefore to regard § 1115 expansion populations as receiving medical assistance under a state plan approved under Title XIX.[9]

## CONCLUSION

**[7]** This appears to be the latest in a series of cases in which the Secretary has refused to implement the DSH provision in

---

waived." *Beno v. Shalala*, 30 F.3d 1057, 1071 (9th Cir. 1994). Furthermore, in letters to the State of Oregon approving the § 1115 project at issue in this case, the Secretary stated that project expenditures would, in accordance with § 1115, be regarded as Title XIX expenditures *for the duration of the project*.

[9]The Secretary presents two additional arguments. First, the Secretary maintained for the first time at oral argument that we should reject the interpretations of the DSH and waiver provisions urged by plaintiffs because those interpretations would result in cross-state inequities. Because the Secretary did not raise this argument earlier, we consider it waived and decline to address it. *Picazo v. Alameida*, 366 F.3d 971, 971-72 (9th Cir. 2004).

Second, the Secretary briefed the argument that his ongoing "refinement" of the DSH policy and refusal to seek reimbursement for funds paid to hospitals that had, before 2000, included expansion populations in their DSH calculations did not warrant remediation through the interpretations of the DSH and waiver provisions plaintiffs urged. This argument appears to misconstrue the nature of plaintiffs' position and is in any case irrelevant given the language of the statutes at issue. Plaintiffs maintain, and we hold, that the DSH and waiver provisions unambiguously require that expansion populations be included in DSH calculations. The clarity of these statutory directives leaves no room for "refinement" by the Secretary.

conformity with the intent behind the statute. *See Alhambra Hosp. v Thompson*, 259 F.3d 1071, 1076 n.4 (9th Cir. 2001); *Cabell Huntington*, 101 F.3d at 990; *Legacy Emanuel*, 97 F.3d at 1266; *Jewish Hosp.*, 19 F.3d at 276; *Deaconess Health Servs. Corp. v. Shalala*, 912 F. Supp. 438, 441, 447-48 (E.D. Mo. 1995), *aff'd*, 83 F.3d 1041 (8th Cir. 1996). In each of these cases, the court rejected the Secretary's position. The same result must follow here. The text of the statute, the intent of Congress, and the decisions of this and other courts make it plain that the entire low-income population actually served by the hospitals—including § 1115 expansion populations—must be accounted for in the DSH Medicaid fraction.

**AFFIRMED**.