KAVANAUGH, Circuit Judge,
concurring in the judgment:
Although the legal question presented here is embedded within a very complex legal scheme and has significant financial ramifications, the question itself is straightforward: If a hospital patient receives Medicare benefits under Medicare Part C for a particular “patient day,” is that patient also “entitled” for that same “patient day” to Medicare benefits under Medicare Part A? In my view, the text of the Medicare statute tells us the answer is no. I agree with the careful analysis by Judge Bates in the District Court: Medicare beneficiaries must choose between government-subsidized private insurance plans under Part C and government-administered insurance under Part A, and after they choose, they are obviously not entitled on the same “patient day” to benefits from both kinds of plans. HHS rejected that interpretation of the text and, as a result, significantly undercompensated Beverly Hospital (and many other hospitals) for the costs of treating Medicare patients. Because HHS misapplied the statute, I would rule for Beverly Hospital and affirm the judgment of the District Court on that ground.
I
Through the Medicare program, the Federal Government provides health insurance to, among others, Americans who are 65 or older. Medicare has several “parts,” two of which are central to this case: Part A provides hospitalization benefits through government-administered fee-for-service hospital insurance, and Part C (previously called “Medicare+Choice” and now called “Medicare Advantage”) provides government-subsidized enrollment in private insurance plans.
The Department of Health and Human Services manages Medicare Part A by paying hospitals a pre-determined sum for each covered inpatient hospitalization service, without regard to the actual cost incurred by the hospitals. HHS is required by statute to disburse extra Part A funds to hospitals that serve a “significantly disproportionate number of low-income patients.” 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). The theory is that, for a variety of reasons, it costs hospitals more to treat significant numbers of low-income patients, and hospitals that do so should therefore receive higher reimbursements. A statutory provision known as the “disproportionate share hospital adjustment” provides a convoluted (to put it charitably) formula for calculating how much extra money HHS must pay to hospitals that disproportionately serve the poor. The formula is designed to measure the proportion of low-income patients at a given hospital for a particular cost-reporting period.
Without delving into too much numbing detail, it suffices here to say that the statutory calculation relevant to this case requires a determination for each hospital of the number of patient days “made up of patients who (for such days) were entitled to benefits under part A of [Medicare].” 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).
Beverly Hospital treated a disproportionately high number of low-income patients during fiscal years 1999 through 2002, and therefore was due to receive extra payments for doing so. The Hospi *19 tal challenges HHS’s calculation of those payments. The Hospital contends that HHS, when applying the formula, improperly counted patients enrolled in Medicare Part C as patients “entitled to benefits under part A,” even though Medicare Part C recipients do not receive benefits under Part A. According to the Hospital, HHS’s misinterpretation of that component of the statutory formula caused the agency to undercompensate the Hospital.
This case boils down to a straightforward question of statutory interpretation: If a person is enrolled in and receives hospitalization benefits for a particular “patient day” through a Medicare + Choice plan pursuant to Part C of Medicare, is that person also “entitled” for that same “patient day” to hospitalization “benefits under part A” of Medicare? In other words, can a patient be both enrolled in Part C and entitled to Part A benefits for the same day ? The answer is no.
Four mutually reinforcing textual points support that conclusion.
First, the language of the key statutory provision requires HHS to focus retrospectively on specific patient days. To reiterate, the statute requires HHS to calculate the number of patient days “made up of patients who (for such days) were entitled to benefits under part A.” 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) (emphasis added). The words “for such days” in the statute make clear that HHS must count specific hospital days for patients who, on those specific days, were entitled to Part A benefits. The word “were” makes clear that this is a backward-looking calculation designed to determine what kind of benefits a specific patient received on a specific day. The statute requires HHS to isolate hospital days attributable to patients who were, on those days, receiving benefit payments through Part A of Medicare. A patient who is receiving benefits under Part A for a given day cannot also receive benefits under Part C for that day. Therefore, in calculating the formula, HHS is required to differentiate Part-C-attributable patient days from Part-A-attributable patient days.
Second, the Medicare statute establishes that “each Medicare 4- Choice eligible individual ... is entitled to elect to receive benefits ... through the original [Medicare fee-for-service program under parts A and B ..., or ... through enrollment in a Medicare + Choice plan under [part C].” 42 U.S.C. § 1395w-21(a)(l) (emphasis added). In other words, a Medicare recipient makes a choice between the different parts of Medicare for purposes of obtaining Medicare coverage. The statute indicates that a patient cannot be enrolled in Part A and Part C at the same time. Once the Medicare recipient chooses a part and enrolls, he or she becomes entitled to benefits under that part, and only under that part. Even though a ParNC-enrolled patient maintains the right to cancel enrollment in Part C and switch to Part A (or vice versa) in a future open enrollment period, on any given day the patient is entitled to hospitalization benefits under only the part of Medicare in which he or she is currently enrolled. A Medicare patient enrolled in Part C on a particular day is therefore entitled to receive benefits under Part C, and not under Part A, for that day. Similarly, a Medicare patient enrolled in Part A on a particular day is entitled to receive benefits under Part A, and not under Part C, for that day.
Third, the Medicare statute provides that “payments under a contract with a Medicare + Choice organization ... with respect to an individual electing a Medicare + Choice plan offered by the organization shall be instead of the amounts which (in the absence of the contract) would otherwise be payable under [Medicare] parts *20 A and B.” 42 U.S.C. § 1395w-21(i)(l) (emphasis added). All Part C enrollees could, if they chose, be enrolled in Part A instead. Section 1395w-21(i)(l) establishes that HHS makes benefit payments under Part C instead of payments the agency would otherwise make under Part A, and that Part C enrollees receive Part C benefit payments instead of Part A benefit payments. As a result, a patient enrolled in Part C on a particular day does not receive benefit payments under Part A for that day.
Fourth, the Medicare statute defines “entitlement” to Part A benefits as follows: “entitlement of an individual to [Medicare part A] benefits for a month shall consist of entitlement to have payment made under, and subject to the limitations in, [Medicare] part A ... during such month.” 42 U.S.C. § 426(c)(1). In other words, “entitlement” is not just an abstract ability to sign up for Part A or Part C. Rather, it is entitlement to have payment made, and a patient at any given time can have payment made under Part A or Part C but not both. Put another way, a Medicare patient enrolled in a Part C plan does not have the right “to have payment made under, and subject to the limitations in, [Medicare] part A.”[1]
That interpretation of “entitlement” as meaning entitlement to be paid is consistent, moreover, with the decisions of the four courts of appeals that have previously interpreted that term in this formula. See Cabell Huntington Hosp. v. Shalala, 101 F.3d 984 (4th Cir.1996); Legacy Emanuel Hosp. & Health Ctr. v. Shalala, 97 F.3d 1261 (9th Cir.1996); Deaconess Health Svcs. Corp. v. Shalala, 83 F.3d 1041 (8th Cir.1996); Jewish Hosp. v. Sec’y of HHS, 19 F.3d 270 (6th Cir.1994).[2] As the Sixth Circuit explained in the first of this line of cases, to be “entitled” to some benefit means that “one possesses the right or title to that benefit.” Jewish Hosp., 19 F.3d at 275 (emphasis omitted). The phrase “entitled to benefits under part A” thus “fixes the calculation upon the absolute right to receive an independent and readily defined payment.” Id. (emphasis omitted); see also Legacy Emanuel, 97 F.3d at 1265 (“Both parties agree that the Medicare proxy only counts patient days paid by Medicare.”); cf. Cabell Huntington, 101 F.3d at 988 (“a patient who is ‘eligible’ for Medicaid becomes ‘entitled’ to payment only after using one of the covered medical services”).
Although it’s not binding on HHS, a recent decision of HHS’s own Provider Reimbursement Review Board also persuasively supports the Hospital’s interpretation here. In a straightforward opinion, the Board reasoned that “once an individual has enrolled in a Medicare + Choice plan *21 under part C, he or she is no longer ‘entitled to benefits under part A,’ because he or she is no longer entitled to have payment made under part A for the days at issue.” Southwest Consulting DSH Medicare + Choice Day Groups v. BlueCross BlueShield Ass’n NHIC Corp., PRRB Dec. No.2010-D52 at 12, reprinted in Medicare & Medicaid Guide (CCH) ¶ 82,679 (Sept. 30, 2010), rev’d, CMS Adm’r Dec. (Nov. 22, 2010).
And of course, it is quite telling that, until 2004, HHS itself interpreted the statute as the Hospital does here. In 2004, HHS abruptly changed course, apparently because of an overriding desire to squeeze the amount of money paid to Medicare providers (and beneficiaries) in light of the country’s increasingly precarious fiscal situation. But this statute does not permit HHS to pursue fiscal balance on the backs of Medicare providers and beneficiaries in this way.
Common parlance and common sense also are consistent with the Hospital’s interpretation of the text. For example, an active-duty member of the military is not permitted to speak at a political rally. You might be entitled to serve in the military, and you might be entitled to speak at political rallies. But you are not entitled to do both at the same time. When a retiree elects a pension benefit when retiring, the retiree is entitled to choose an annuity or a lump sum, but not both. Or consider the NFL’s rules on the coin toss: ■ If you win the toss, you are entitled to choose possession or which goal to defend, but not both. So it is with Part A and Part C of Medicare.
II
The majority opinion does not directly take issue with any of the above textual analysis showing that, for purposes of § 1395ww(d)(5)(F)(vi), a Part C beneficiary is not “entitled” to Part A benefits for a specific patient day.[3] According to the majority opinion, the Hospital’s interpretation of “entitled” nonetheless cannot be accepted because it would cause problems for or anomalies in the implementation of certain other statutory provisions. And those problems or anomalies show, the majority opinion says, that the Hospital’s interpretation of § 1395ww(d)(5)(F)(vi) is not correct. I disagree with the majority opinion’s bank-shot approach to interpreting § 1395ww(d)(5)(F)(vi).
A
The majority opinion cites § 1395w-21(d)(2)(A), a provision that requires annual notice to Part A beneficiaries (those “entitled” to benefits under Part A) of their option to enroll in Part C. See Maj. Op. at 7. The majority opinion expresses concern that, under the Hospital’s approach, this provision might not require notice to Part C enrollees. That concern is misplaced because HHS puts all of the relevant information on its website and in practice notifies both Part A and Part C beneficiaries of their available options. That’s presumably because a different subsection of this provision requires that HHS “broadly disseminate information to medicare beneficiaries (and prospective medicare beneficiaries) on the coverage options provided under this section in order to promote an active, informed selection.” 42 U.S.C. § 1395w-21(d)(l). The apparent point of the precise statutory notice re *22 quirement in subsection (d)(2)(A) is simply to ensure that non-Part C individuals learn about Part C options, which is precisely what would still be required under the Hospital’s interpretation. In short, contrary to the majority opinion’s suggestion, subsection (d)(2)(A) creates no barrier to the Hospital’s, interpretation.
Probably more important in the bigger picture here, the majority opinion’s reliance on the relatively minor open-season notice provision to interpret the hugely significant statutory reimbursement formula, which involves hundreds of millions of dollars annually, amounts to using a very small tail to wag a very large dog. Even if the Hospital’s interpretation would create an anomaly (as the majority opinion sees it) in the open-season notice provision, that anomaly would be inconsequential, as explained above, and in any event would not be a good reason to rewrite the statutory text of the reimbursement formula and thereby shift responsibility for hundreds of millions of dollars in costs from the government to hospitals and Medicare beneficiaries.
Next, citing § 1395w-22(c)(2), the majority opinion suggests that Part C enrollees would not be able to obtain plan information from their.Part C plans under the Hospital’s interpretation. See Maj. Op. at 7-8. HHS did. not rely on this statutory provision in its brief, and for good reason. The preceding subsection, § 1395w~ 22(c)(1), requires Part C plans to give similar information to all of their Part C enrollees. The difference in language between §§ 1395w-22(c)(l) and 1395w-22(c)(2) actually supports. the Hospital’s approach here.
Next, the majority opinion cites § 1395w-21(h)(l). See Maj. Op. at 8. This is another provision that HHS has not relied upon. In any event, this provision, too, does not cause any problems if applied only to non-Part C enrollees. Under the Hospital’s interpretation, the provision would require HHS’s approval before Part C plans send marketing materials to Medicare beneficiaries who are not yet signed up for such a Part C plan. Contrary to the majority opinion, I find nothing odd about that.
The majority opinion then turns to § 1395w-24(e)(l)(B) and (e)(4)(B). See Maj. Op. at 8-9. Again, the majority opinion has dredged up statutory provisions that HHS has declined to rely on. (HHS was well-represented in this case, so the majority opinion is not making up for deficiencies of counsel. ■ Rather, it is citing provisions that even'- HHS — which has been dealing with this issue for years — has not relied upon.) I frankly see no anomaly with respect to these provisions that would result from the Hospital’s interpretation. What those provisions mean quite simply and quite obviously is that Part C enrollees cannot be forced to pay more than Part A and Part B beneficiaries for the same benefits.
The majority opinion cites § 1395w-21(e)(2)(D) and claims that the Hospital’s interpretation would mean that an institutionalized Part C patient could not change plans. See Maj. Op. at 9. But an institutional patient who dropped his Part C plan would then be entitled to Part A benefits and thus eligible to sign up for a different Part C plan. So there’s no problem or anomaly there.
The majority opinion cites § 1395w-23(o )(3)(B)(ii), a provision about qualifying counties. See Maj. Op. at 9-10. This, too, is yet another provision that HHS has not cited. I again fail to see the confusion the majority opinion thinks would be created here if we accepted the Hospital’s interpretation. It is quite clear that the determination of qualifying counties examines whether 25% of those in a particular area *23 who could sign up for Medicare Part C did sign up for Medicare Part C.
The majority opinion points to § 1396d(p)(l) and says that the Hospital’s interpretation would cause Medicare rather than Medicaid to pay for poor Part C patients. See Maj. Op. at 9-10. (Medicaid typically pays for the hospital expenses of poor Medicare patients.) Putting aside the fact that there are relatively few poor Part C patients, a separate statutory provision, § 1395w-22(a)(7), makes abundantly clear that Medicaid and not Medicare will pick up the costs for such patients. So the majority opinion’s far-afield citation to § 1396d(p)(l) does not pose any barrier to or inconsistency with the Hospital’s interpretation of the term “entitled” in the statutory reimbursement formula contained in 42 U.S.C. § 1395ww(d)(5)(F)(vi).
The majority opinion also cites § 1395w-27(e). See Maj. Op. at 10-11. Here, the majority opinion is on particularly shaky ground. This statute sets forth a formula that allowed HHS to collect fees from Part C plans, subject to certain caps, for fiscal years 2001 to 2005. The problem is that the majority opinion here has accepted the Hospital’s interpretation of this statute for the years before 2004. The majority opinion thus blesses the Hospital’s interpretation for fiscal years 2001, 2002, and 2003 and yet says simultaneously that the Hospital’s interpretation would create a “nonsensical result” with respect to § 1395w-27(e)(2)(B), which applies to those same years. Maj. Op. at 10. How can that be?
The majority opinion then cites § 1395w-27a(f)(4)(A). See Maj. Op. at 11. This is still another provision that the majority opinion cites but HHS did not. And this provision likewise does not cause any problems under the Hospital’s interpretation. Indeed, the majority opinion’s attempt to create confusion about this provision appears severely strained in context (which is probably why HHS did not cite it). This provision in context asks a simple question: How many people in the area could have signed up for Part C but didn’t?
B
To summarize the prior discussion: The majority opinion has cited a series of statutory provisions on the theory that the Hospital’s interpretation of § 1395ww(d)(5)(F)(vi) — that a Part C beneficiary is not entitled to Part A benefits for a particular patient day — would cause anomalies in other provisions of the statute. But there are no such anomalies. Neither in isolation nor in combination do those provisions undermine the straightforward interpretation of § 1395ww(d)(5)(F)(vi) advanced by the Hospital and accepted by the District Court.[4]
Moreover, there is a serious overarching problem with the majority opinion’s approach that is perhaps easier to explain.
*24 The majority opinion confidently proclaims that the Hospital’s interpretation, if accepted, would apply to a host of other provisions and cause problems or “nonsensical” results with respect to everything from open-season notices to caps on hospitals’ payments for the costs of counseling programs. But then, the majority opinion turns around and says that the Hospital’s interpretation actually controls for the years up until 2004. How can both things be true? How can the majority opinion endorse — at least for all the years up until 2004 — the same “nonsensical” results that it simultaneously decries?
I think the explanation is that the majority opinion has vastly overblown the supposed inconsistencies that the Hospital’s interpretation would cause with respect to other statutory provisions. Indeed, it is plain that the majority opinion’s concerns are misplaced because there is a historical record against which to check its dire predictions of “nonsensical” and “strange” and “odd” results. As the majority opinion says, HHS itself accepted the Hospital’s interpretation until 2004. Yet HHS, while accepting the Hospital’s interpretation of § 1395ww(d)(5)(F)(vi), managed to implement the rest of the statutory provisions cited by the majority opinion without any apparent confusion or meltdown. I am not aware of — and the majority opinion certainly cites no — “nonsensical” or “strange” or “odd” results that occurred before 2004 with respect to those other provisions. So it turns out that the majority opinion is wrong in saying that the Hospital’s interpretation, if accepted, would cause tumult in other parts of the statute.
By attempting to say that the Hospital’s interpretation (i) was controlling until 2004 and (ii) cannot be right because of all the “nonsense” that would ensue, the majority opinion has twisted itself into a knot. The way to untie the knot, in my respectful view, is to recognize that the Hospital’s interpretation not only was controlling until 2004 but is correct even now. At a bare minimum, the majority opinion cannot plausibly rely on the supposed anomalies that the Hospital’s interpretation would cause for other provisions of the statute and simultaneously endorse the Hospital’s interpretation for the pre-2004 years.
The majority opinion says that the Medicare statute is complicated. True enough. But the question here concerns a specific provision, not the entire Medicare code. Complexity in the code as a whole does not mean ambiguity in a specific provision. No one can fault the majority opinion’s time and effort in examining this statute. But the fact that it takes a while to figure out the meaning of a specific statutory provision based on its text and context is not the same as ambiguity. What matters for the Chevron analysis is not how long it takes to climb the statutory mountain; what matters is whether the view is sufficiently clear at the top. Here, despite HHS’s effort to fog it up, § 1395ww(d)(5)(F)(vi) is sufficiently clear in establishing that a Part C beneficiary is not simultaneously entitled to benefits under Part A for any specific patient day.
The Medicare statute provides a very specific, carefully reticulated formula for calculating supplemental payments to hospitals that serve a disproportionate number of low-income Medicare patients. By counting patients enrolled in Part C plans as “entitled to benefits under part A” for specific patient days, HHS misapplied the statute and undercompensated Beverly Hospital. On that ground, I would affirm the District Court’s decision to vacate and remand this matter to HHS.

. HHS rejects this interpretation of the word "entitled” in the phrase "entitled to benefits under part A,” but accepts the same interpretation in the phrase "entitled to supplemental security income benefits,” even though both phrases are found in the same sentence of the statute. See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) ("patients who (for such days) were entitled to benefits under part A ... and were entitled to supplemental security income benefits”); 75 Fed.Reg. 50,-042, 50,280-81 (Aug. 16, 2010) (patients are "entitled” to SSI benefits only when they actually receive SSI payments). HHS thus interprets the word "entitled” differently within the same sentence of the statute. The only thing that unifies the Government's inconsistent definitions of this term is its apparent policy of paying out as little money as possible. I appreciate the desire for frugality, but not in derogation of law.

. Those courts were focused on a different phrase in the statute — "eligible for” Medicaid rather than "entitled to” Medicare — but had occasion to discuss the meaning of "entitled to” Medicare as contrasted with "eligible for” Medicaid.

. Part II.A of the majority opinion rejects the Hospital’s Chevron step one argument, but then Part II.B of the majority opinion rules for the Hospital anyway because HHS had a different position back before 2004. Part II.A of the majority opinion thus is unnecessary given the majority opinion’s conclusion.

. In response to my opinion, the majority opinion raises doubt about the Hospital's interpretation of the statute but declines to say whether HHS's interpretation of the statute is permissible. See Maj. Op. at 13 ("we do not reach that question”). In D.C. Circuit parlance, the majority opinion leaves open the possibility that HHS’s interpretation might fail at Chevron step two. From my perspective, HHS's interpretation violates the statute, whether at Chevron step one or Chevron step two. In any event, it's important to underscore that this critical statutory question remains open, at least under Chevron step two analysis, for resolution in future cases that involve reimbursement for the years after 2004 — that is, for the years after the years at issue in this case and after HHS adopted its current interpretation of the statute.